UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | Cr. No. 06-19 (EGS) |
| v. | : | |
| | : | |
| | : | Status: March 16, 2007 |
| AKUIBER NDOROMO JAMES | : | |
| | : | Trial: March 23, 2007 |
| Defendant. | : | |
| | : | |
| | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS STATEMENTS, TO SUPPRESS PHYSICAL EVIDENCE AND TO DISMISS INDICTMENT AND POINTS AND AUTHORITIES IN SUPPORT THEREOF**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's motions to suppress statements, to suppress physical evidence and to dismiss the indictment. The government respectfully asks the Court to summarily dismiss these baseless, boiler-plate motions. The motion to suppress statement relies on an absurd description of the completely legal and proper search of the defendant's home/office. The motion to suppress physical evidence relies on this same description and then makes a conclusory claim that the search was over-broad without providing any evidence of this. The motion to dismiss the indictment is a potpourri of false factual statements and unsupportable legal arguments.

## I. STATEMENT OF FACTS

This case is about the defendant, Akuiber Ndoromo James, illegally billing Medicaid for over one million dollars for transportation services that were not provided. As part of the scheme to defraud Medicaid, the defendant repeatedly billed Medicaid for beneficiaries he never transported, or for beneficiaries after they stopped using the defendant's service, or for beneficiaries after they died.

The defendant was the President/Chief Executive Officer of Voice of Social Concern Association, Inc. (VSCA), a non-emergency transportation company whose business address, 3636 16th Street, Apt. B1235, NW, Washington, D.C. 20010, also served as the defendant's home. Effective January 10, 2001, VSCA became a D.C. Medicaid transportation provider. VSCA had two provider numbers–one for Mental Retardation and Developmental Disability Administration Waiver Transportation and the other for Non-Emergency Transportation. The defendant completely controlled VSCA's bank account and signed D.C. Medicaid's Direct Deposit Enrollment form as VSCA's Chief Financial Officer/Authorized Representative.

Medicaid reimbursed transportation providers approximately $30 per round-trip. The defendant owned or operated approximately three to five vans for his three to five drivers. In order to receive reimbursements from Medicaid, the defendant was required to maintain a "Daily Transportation Log." The defendant regularly signed claims purporting to document transportation services provided to beneficiaries and submitted them to a private billing company retained by D.C. Medicaid. D.C. Medicaid, in turn, sent checks in the amount of the claim via the U.S. Mail to VSCA at the defendant's residence or by wire directly to VSCA's Bank of America checking account.

D.C. Medicaid paid the defendant approximately $295,000 in 2002, $590,000 in 2003, and $660,000 through September 30, 2004 for transportation services, for a total of approximately $1,550,000. D.C. Medicaid records indicate that these totals make the defendant one of the highest paid providers of transportation services in D.C. by over one million dollars. Because Medicaid set up the system to evenly divide the trips and therefore the money, no company should have made significantly more money than any other. D.C. Medicaid paid the average transportation company $52,000 in 2002, $60,000 in 2003 and $71,000 in 2004.

Investigators with the Office of the Inspector General of the Department of Health and Human Services and the Medical Assistance Administration initially reviewed fifteen of the beneficiary numbers most frequently used by the defendant. The investigation revealed that none of these fifteen beneficiaries received the transportation services claimed by the defendant, but D.C. Medicaid paid him approximately $130,000 for just these fifteen beneficiaries. Of the fifteen, eleven were interviewed, three had been pronounced dead prior to the purported dates of service, and one individual did not go to any D.C. Medicaid approved service centers. Each of the eleven beneficiaries who were interviewed stated that they had not received the transportation services claimed by the defendant. In some cases, the beneficiaries stated that they never used the defendant's services, and never gave the defendant their Medicaid numbers. In other cases, the beneficiaries used the defendant's van service only a few times, but the defendant made Medicaid claims amounting to thousands of dollars for these beneficiaries after they stopped using the service.

Many of the defendant's supposed clients, particularly those for whom VSCA billed large amounts, are ex-heroin users who the defendant purportedly transported to methadone clinics. According to Medicaid there was one "pilot program" that permitted transportation to one

methadone clinic, PIDARC. A review of the beneficiaries the defendant allegedly transported to methadone clinics revealed only one authorized beneficiary. With respect to the other beneficiaries the defendant claimed, they were not authorized to be transported, not authorized to be transported by the defendant, and/or they were not transported as many times as the defendant claimed.

On December 20, 2004, law enforcement agent's presented U.S. Magistrate Judge John J. Facciola with a warrant to search the defendant's home/office at 3636 16th Street, NW, Washington, D.C. Attachment 1. At the same time, agents presented warrants to seize property illegally obtained. Judge Facciola signed these warrants. Among other things, the warrant for the defendant's home/office permitted the agents to seize all documents, contracts, manuals, personnel files, business records, computers and electronic storage devices related to the defendant's scheme to defraud Medicaid. Attachment 1, Schedule B.

On December 22, 2004, agents executed the warrant on the defendant's home/office. The defendant, who was wearing boxer shorts, was handcuffed and placed in a chair at his dinning room table. An agent told the defendant that he was not under arrest but would remain handcuffed until the apartment was declared safe. Agents asked the defendant if anyone else was in the apartment and if there were any weapons in the apartment. Agents quickly cleared the apartment and then retrieved pants and a shirt for the defendant. The defendant's handcuffs were then removed and he was asked to remain seated. Agents sat at the defendant's dining room table and asked if we would be willing to give a statement, and the defendant voluntarily agreed to do so. Agents read the defendant his Miranda Rights and he read and signed the IS Form 1067, Warning and Waiver of Rights Form. Attachment 2. The defendant voluntarily spoke to the agents from 8:05 a.m. until 10:05 a.m. At no time, did the Agents remove the defendant from his apartment.

On January 25, 2005, the defendant voluntarily appeared at the U.S. Attorney's Office and answered questions during a two and a half hour proffer session with the defendant's first (of three) attorney present.

On February 3, 2006, the defendant was arrested at a friend's home. When the defendant came to the door, he was again wearing boxer shorts. Agents directed him to the threshold of his apartment for agent safety and provided him with pants and a shirt as soon as practicable–no more than ten minutes. The only people to see the defendant in his boxers over this short period of time were the agents and the defendant's own female friend. The defendant did not make a post-arrest statement.

Since the search and seizure, the defendant has repeatedly filed documents in which he has voluntarily provided his account of the scheme.

## II.  ARGUMENT

**A. The Defendant's Motion to Suppress Statements is Meritless Because His Factual Statement Is Untrue And He Voluntarily Waived His Miranda Rights**

The defendant challenges the voluntariness of his statement because he now claims that law enforcement officers "forced [him] to stand naked in a public hallway for hours while they conducted a search of his premises." Def. Motion to Suppress Statements at Paragraph 6. This allegation is utter fantasy. Because the defendant was not under arrest and was free to refuse the requested interview, it is arguable that the agents did not even have to give the defendant Miranda (Miranda v. Arizona, 384 U.S. 436 (1966)) warnings prior to interviewing him. "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or

restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U. S.1121, 1125 (1983).   Nonetheless, out of an abundance of caution, the agents provided the defendant with Miranda warnings and he voluntarily read and signed the waiver form.

The defendant's Fifth Amendment argument is laughable.  The totality of the facts and circumstances plainly demonstrate that the defendant's waiver of rights was knowing and voluntary, and that his statements, made after he was advised of his rights, were also voluntary. First, it is clear that appellant was advised of his rights and waived them before he submitted to his interview with the agents.  See Waiver of Rights Form, Attachment 2.   Second, the defendant's account is nonsensical.  The defendant was never naked and he was never taken out of his apartment during the search or interview.

Because, as the defendant acknowledges (Def Motion re Statement para. 2), the agents gave the defendant his Miranda warnings, he has an enormous burden to overcome to now say that his statement should be suppressed as involuntary.  Missouri v. Seibert, 542 U.S. 600, 608-9   (2004) ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver.")

Assuming arguendo that the defendant's account were true, which it is not, he still would not have a valid claim that his waiver was involuntary.  The defendant, a 42 year-old U.S. Citizen with a Bachelor's of Science degree, claims that agents woke him up early in the morning in his apartment while executing a search warrant and while he was waiting outside of his apartment naked, they questioned him.  Courts have found people interviewed in much more stressful situations to have

given voluntary statements. See Bliss v. United States, 445 A.2d 625, 627-629 (D.C. 1982) (Over five hours after having been shot in the leg around 3:00 a.m. causing it to break and after being brought from the hospital to the police station without a shirt, defendant's confession deemed voluntary because he was given and waived his Miranda rights); United States v. Yunis, 859 F.2d 953, 955-957 (D.C. Cir. 1988) (Twelve hour statement of non-English speaking defendant with broken wrists resulting from the arrest who was interviewed after getting seasick on a ship while being extradited from Lebanon found voluntary); and United States v. Pineda, 2006 WL 785287 (D.C. Cir. 2006).

The defendant's boiler-plate citation to inapposite cases with no indication of how they are factually relevant goes to show just how far-fetched this motion is. In fact, in three of the cases the courts ruled that there was no 5th Amendment violation. See United States v. Rodriguez, 948 F.2d 914 (5th Cir. 1991); United States v. Westmoreland, 982 F. Supp. 376 (S.D. W.Va. 1997); and United States v. Russell, 411 U.S. 423, 431-32 (1973).

The motion to suppress the defendant's statement should be summarily denied without a hearing.

### B. The Defendant's Motion to Suppress Physical Evidence is Meritless

The defendant's Motion to Suppress Physical Evidence is based primarily on the same invented factual scenario as the defendant's Motion to Suppress Statement. See Supra. As such, it should be summarily dismissed because the defendant was never left naked in a hallway in his apartment building during the valid execution of a valid search warrant. As with the Motion to Suppress Statement, the defendant relies on inapposite case law (with no attempt to make a factual analysis) that, if anything, fully supports the government.

As a second basis, the defendant claims that everything seized should be suppressed because he claims that some of the items were outside the scope of the search warrant. The government specified the financial records it intended to search for and seize in paragraphs 6, 7 and 9 from Schedule B of the Search Warrant. Attachment 1. The government complied with the warrant. As for the defendant's complaint concerning "the non-profit arm of" VSCA, the government disputes the validity of any such "arm" and to the extent such an "arm" may have existed, the defendant knowingly commingled all of the funds. The seizure of immigration documents was completely valid as the seizure of "records sufficient to identify former and current employees or contractors associated with VSCA." Attachment 1 at para. 5.

The defendant is misguided when he seeks support in United States v. Srivastava, 444 F. Supp. 2d 385 (E.D. Md. 2006). Srivastava is a non-binding case where an agent testified that he intentionally ignored the limited language of the search warrant when deciding to seize thousands of documents beyond the scope of the warrant. There is no evidence of such conduct by the agents in the case at bar. The only relevance of Srivastava is that it describes just how rare the remedy requested by the defendant is. "This Court is mindful that it is a rare situation indeed where agents are found to be so excessive in their execution of search warrant that blanket suppression is warranted, but in light of SA Marrero's alarming testimony, the undersigned finds inexorable the conclusion that this rare remedy is appropriate in this case." Id. at 399-400. The defendant cites just three "examples" of allegedly over-broad seizures. Two of the examples (bank records beyond the time of the fraud and activities of the non-profit arm) are so ambiguous as to be impossible for the government to fully defend. The third example (immigration papers) is valid on its face.

The government respectfully requests that this baseless motion be denied without a hearing.

### C. The Defendant's Motion to Dismiss Indictment Is Completely Meritless

The government has no idea what the defendant is arguing in his Motion to Dismiss Indictment. The indictment is specific and provides the defendant with all of the notice required. The defendant's conclusory motion ignores the fifteen page indictment. The government has already provided the defendant with virtually open discovery in this case having scanned every document and provided the defendant with electronic copies of those documents. In addition, as part the provision of a plea offer in this case, the government sat down with the defendant and his prior attorney and presented an hour-long power-point slide show explaining the case against the defendant. The government has provided the defendant with all of the documents seized from his home/office. The defendant's claim that the government is withholding documents from him is baseless. Finally, the government has no clue where the defendant comes up with the $1,914.00 loss figure. As with the other motions, this motion should be summarily denied.

### D. Government Requests Permission to Late File Opposition

The government apologizes to the Court for filing this Opposition late. The government failed to note the deadline for the opposition and was basing its response time on the March 16, 2007 hearing date. As the defendant can show no prejudice from this admittedly late filing, the government would respectfully request that the Court accept this Opposition.

## III. CONCLUSION

For the forgoing reasons the government respectfully requests that the Court summarily deny each of the defendant's factually inaccurate, ambiguous and legally unsupported motions.

        Respectfully submitted,

        JEFFREY A. TAYLOR
        United States Attorney

        _____

BY:   ROY L. AUSTIN, JR.
        Assistant United States Attorney
        Fraud & Public Corruption Section
        555 4th St., NW
        Washington, D.C. 20530
        (202) 353-9458