**ATTACHMENT 1 CONTINUED**

Search Warrant for Defendant's home office

or twice every other week to attend medical appointments. A review of Medicaid claims data revealed that VSCA billed and received payments from Medicaid for transportation services provided to M.A. from October 7, 2002 to June 2, 2004 in the amount of $12,234.00 for services not rendered.

9. In another example, from March 13, 2002 to December 12, 2003, VSCA billed and received payments in the amount of $12,242 from the Medicaid program for providing E.M with round-trip transportation services. On September 3, 2004, E.M. was interviewed. E.M. stated that E.M. last used a van transportation company approximately three years ago. E.M. could not remember the name of the company but remembered that the owner/driver resided at the Woodner Apartments, which is located on 16th Street, NW, Washington, D.C. E.M. described the owner/driver as a short, black, male, with a dark complexion, who spoke with an African accent. The address and description of the owner/driver are consistent with that of Akiuber James. E.M. also stated that after significant weight loss and improvements to E.M.'s health, E.M. no longer needed to rely on van transportation. E.M. utilizes the public transportation system (Metro) and has done so for approximately three years.

10. As stated above, the initial "spot check" of VSCA's claims also revealed that VSCA had been submitting claims asserting they had provided transportation for beneficiaries who had died prior to the dates VSCA claimed to have provided them services. Three individuals (B.B., C.B., and J.B.) were found to be deceased prior to the date of service that VSCA claimed to have transported the beneficiaries. VSCA fraudulently billed D.C. Medicaid for these three beneficiaries on 210 claims for a total of approximately $6,930, although D.C. Medicaid only paid VSCA for 44 of these claims for approximately $1,452. For example, on March 10, 2004, Medicaid recipient J.B. was pronounced deceased, according to the Vital Records Department in Washington, D.C. However, VSCA submitted 42 claims for J.B., totaling approximately $1,386, after March 10, 2004.

11. Also, VSCA billed D.C. Medicaid for a beneficiary (L.P.) who did not go to any D.C. Medicaid-approved service centers. L.P.'s Medicaid number was only found on VSCA claims, and not on any other Medicaid-related health care service reimbursement claims. D.C. Medicaid's policy states that a van transportation company can only be used to transport Medicaid beneficiaries to Medicaid-approved appointments. That is, VSCA could only submit claims for transportation provided to beneficiaries who were going to or from appointments with other Medicaid providers, e.g., doctors, hospital, physical therapists. Because this beneficiary's number had not been submitted by other providers for reimbursement, it is likely this beneficiary did not receive services from other providers and therefore did not use VSCA for transportation. VSCA billed D.C. Medicaid for L.P. on 499 claims for a total amount of approximately $15,339.

12. Another check of dates also revealed a pattern further suggestive of the amplitude of the fraud carried out by VSCA. D.C. Medicaid investigators reviewed claims submitted by VSCA to the D.C. Medicaid program during the period January 1, 2002 to June 2, 2004, for specific dates upon which one would not expect to find significant, if any, transportation services provided, i.e., Christmas Day 2002, New Year's Day 2003, Fourth of July 2003, and during a 16-inch snowstorm that immobilized the Washington, D.C. Metro area on February 17, 2003 through February 19, 2003. For just these six days, VSCA – a provider of transportation for non-emergency medical care – billed Medicaid a total of approximately $3,948.75, based upon 133 total transportation service claims.

## LOCATIONS TO BE SEARCHED AND EVIDENCE TO BE SEIZED

As stated above, VSCA lists its business address as Apartment B1235, 3636 16th Street, N.W., Washington, D.C. This address is listed on VSCA's checking account at the Bank of America, and is the address listed for the company with D.C. Medicaid. This address is also the address visited by

D.C. Medicaid reviewers in April 2004, and wherein VSCA's records were found and reviewed. This is also James' residence.

The second location to be searched, Apartment 207, 3025 15th Street, N.W., Washington, D.C., appears to be the residence of Mary Khangaa. VSCA bank records indicate that Ms. Khangaa is paid periodically by VSCA. On or about December 15, 2004, Ms. Khangaa gave federal investigators a business card that stated she was the office manager for VSCA. The investigators called the VSCA number and spoke with Ms. Khangaa by phone. The circumstances of the phone call (as well as a subsequent phone call and a visit to her residence several hours later by the investigators) indicated that Ms. Khangaa was speaking to the investigators from her residence. She told investigators that she could transcribe all of the relevant information they would provide over the phone and then she could obtain Medicaid transportation authority through her computer there (where she was speaking from). When the investigators later spoke with her at the entrance to her residence, she retrieved three VSCA business cards from her residence, two of which she indicated were for her drivers and the third card was hers, which identified her as VSCA's Office Manager. She made statements to investigators that the VSCA business for which she worked was associated with that residence. Within minutes of leaving her apartment, the investigators called the VSCA number again, and Ms. Khangaa answered – confirming that she was working from her residence.

Based on my knowledge, training and experience, Medicaid Providers such as VSCA, who conduct business from their residences, also maintain the books and records at those locations. Additionally, businesses that receive reimbursements from Medicaid are required to maintain business records for 6 years in order, among other reasons, to provide support for revenue and expense transactions if questioned by Medicaid auditors, Internal Revenue Service examiners, or other

-9-

auditors, at a later date. Such businesses often use electronic equipment such as computers, facsimile machines, pagers, and telephone answering machines to generate, transfer, count, record and/or store information pertaining to the claims or financial transactions in which they are involved, especially when the business is required to maintain records to support its Medicaid claims.

Based on my knowledge, training, and experience, your affiant believes that Medicaid providers commonly maintain addresses or telephone numbers in books, papers, and/or computers which reflect names, addresses and/or telephone numbers of Medicaid recipients, as well as other individuals who may be associates in their fraudulent schemes, as well as various business records evidencing such schemes. These materials are generally kept in the locations from which the business operates; in this case, Mr. James' and Ms. Khangaa's residences.

## ELECTRONIC EVIDENCE

Your affiant knows that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important aspects: (a) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (b) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are instrumentalities, fruits, or evidence of crime, or storage devices for information about crime.

Based upon the facts set forth above, there is probable cause to believe that computer hardware, software, related documentation, passwords, data security devices (as described below), and data found at the business/residence of VSCA and James, were integral tools of these crimes and constitute the means of committing it. As such, they are instrumentalities and evidence of the

-10-

violations designated. Rule 41 of the Federal Rules of Criminal Procedure authorizes the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them.

<u>Hardware</u>: Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing devices (such as central processing units); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, video display monitors, and related communications devices (such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

<u>Software</u>: Computer software is digital information that can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form, including zip drives. It commonly includes programs to run operating systems, applications (like tax preparation, word-processing, or spreadsheet programs), and utilities.

<u>Documentation</u>: Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

<u>Passwords and Data Security Devices</u>: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or other programming code. A password (a string of alphanumeric characters) usually operates a sort of digital key to unlock particular data security devices. Data security hardware may include encryption devices, chips, and

circuit boards. Data security software or digital code may include programming code that creates test keys or hot keys, which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or booby-trap protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

Based upon my knowledge, training and experience, and consultations with computer specialists from the Department of Health and Human Services, your affiant knows that searching and seizing information from computers almost always requires agents to seize most or all electronic storage devices (along with related peripherals, as discussed below) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

Volume of Evidence: Computer storage devices (like hard disks, and diskettes) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

Technical Requirements: Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. However, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.

Based upon my knowledge, training and experience and consultations with forensic computer examiners, your affiant knows that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following.

The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly reconfigure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

If, after inspecting the I/O devices, software, documentation, and data security devices, the analyst determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will return them within a reasonable time.

Data analysts may use several different techniques to search electronic data for evidence or instrumentalities of crime. These include, but are not limited to, the following: examining file directories and subdirectories for the lists of files they contain; opening or reading the first few pages of selected files to determine their contents; scanning for deleted or hidden data; searching for key words or phrases ("string searches").

This specifically excludes a search of any kind of unopened electronic mail, and no warrant is herein sought for such unopened electronic mail. If unopened electronic mail is to be searched, a separate warrant will be sought supported by probable cause.

Based on the foregoing information and upon my knowledge, training and experience in the investigation of health care fraud, your affiant believes that fruits and evidence of the commission of a criminal offense, as described below in Schedule B, will be found at the premises listed and described below in Schedule A, and therefore, a search warrant should be issued for Apartment B1235, 3636 16th Street, N.W., Washington, D.C., and Apartment 207, 3025 15th Street, N.W., Washington, D.C.

WHEREFORE, your affiant believes based on the information provided that probable cause exists for search, and seizure warrants to be issued for the above identified and described locations, for evidence of violations of Title 18 United States Code Sections 1347 (Health Care Fraud) and 1341 (Mail Fraud).

_____
Elton Malone
Special Agent

2 0 DEC 2004

Subscribed as sworn to before me this _____ day of _____, 2004, at Washington, D.C.

_____
United States Magistrate Judge
John M. Facciola
U.S. Magistrate Judge

-14-

## SCHEDULE A

The address of the first location to be searched is Apartment B1235, 3636 16th Street, N.W., Washington, D.C. Apartment B1235 is located on the twelfth (12th) floor of B tower. The entrance door to that apartment is blue and the number plate B1235 is affixed on the door.

The address of the second location to be searched is Apartment 207, 3025 15th Street, N.W., Washington, D.C. Apartment 207 is located on the second floor, and the entrance door to that apartment is white and the number 207 is affixed on the door.

## SCHEDULE B

The following items are to be seized:

1. Daily pick-up sheets, vehicle run sheets, any information identifying client transport and/or medical condition.

2. All contracts with any and all hospitals, clinics, nursing homes, retirement communities, group homes and dialysis centers for providing non-emergency transportation to Medicaid recipients.

3. All standing orders as ordered by First Health or ACS.

4. All manuals, correspondence, training materials or any other documentation related to policies and practices involving internal memorandums or otherwise regarding transportation services.

5. All personnel files and records sufficient to identify former and current employees or contractors associated with VSCA, including date of birth, job title, and description, dates and scheduled hours of employment, and home addresses and telephone numbers.

6. Documents relating to the interpretation, preparation, or submission of healthcare claims, claim forms, billing instructions, coding instructions, and explanation of benefit forms. Records, correspondence, reference materials, and any other materials provided, produced, or generated by contract carriers relating to billing codes, billing procedures, handling of claims and types of coverage provided.

7. All business records and client documents, including but not limited to, insurance claim forms, receipts, appointment books/calendars, telephone message logs and any correspondence to and from VSCA or James in his capacity as VSCA's principle, or Khangaa in her capacity as VSCA's Office Manager. Any mail matter or documents identifying VSCA, James or Khanga as the occupants of the locations to be searched.

8. All records relating to access numbers, storage facility rental agreements and/or contracts, keys to storage lockers or other storage-type facilities, or U.S. mail depository access keys.

9. All business and personal business financial records relating to business transactions, including but not limited to business and personal checks, checking, savings and other financial institution account statements, credit/financing applications and statements, credit identifications, account numbers, investments and purchase records for supplies, automobiles and equipment.

10. Electronic equipment, such as computers, computer hardware, telex machines, facsimile machines, currency counting machines, telephone answering machines, and related manuals used to generate, transfer, count, record and/or store the information described in this Schedule. Additionally, computer software, related documentation, passwords, data security devices, tapes and discs, audio tapes, and the data and contents therein, containing the information generated by the aforementioned electronic equipment.

11. Cellular telephones(s) and /or portable cellular telephones(s), and any stored electronic communications contained therein.