# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA    ) | |
| ) | |
| v.        ) | Criminal No. 06-019 (EGS) |
| ) | |
| AKIUBER NDOROMO JAMES, et al.   ) | |
| Defendant.   ) | |

## UNITED STATES' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS TO REVERSE THE CONVICTION AND FOR IMMEDIATE RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's September 14, 2007 pro se Motion to Reverse the Conviction Due to Ineffective Attorney and Government's Violations of Sixth Amendment, and his pro se motions for the conviction to be vacated and for immediate release under 28 U.S.C. § 2255, filed on February 19, 2008, and March 27, 2008.[1]

## SUMMARY

In this case, defendant, Akiuber Ndoromo James, illegally billed the District of Columbia's Medicaid program (administered by the D.C. Department of Health's Medical Assistance Administration) for over one million dollars' worth of transportation services that were not provided. As part of his scheme to defraud Medicaid, defendant repeatedly billed Medicaid for beneficiaries whom he never transported, who had stopped using defendant's

---

[1]On March 19, 2008, defendant filed two pro se Petitions for Writ of Mandamus for Immediate Recusal of Judge Emmet G. Sullivan. Dist. Ct. PACER Docket Entry ##80 and 81. On April 7, 2008, one of these petitions was dismissed by the Federal Circuit for lack of jurisdiction. Dist. Ct. PACER Docket Entry #87 (filed April 8, 2008). Just as the government opposed defendant's motion for recusal filed on January 10, 2008, and denied by this Court on February 15, 2008, the government finds all of defendant's claims in his petitions for writ of mandamus to be without any factual or legal basis, and, thus, without merit.

transportation service, or who had died.  On March 30, 2007, a jury found defendant guilty of

twenty offenses relating to defendant's scheme to defraud the District of Columbia's Medicaid

program.  The offenses of conviction include health care fraud, 18 U.S.C. § 1347; making false

statements regarding health care matters, 18 U.S.C. § 1035(a)(2); and money laundering, 18

U.S.C. § 1957.  On April 2, 2007, the jury returned a verdict forfeiting over $1.8 million and two

vehicles.  Defendant has not yet been sentenced.

        In his three motions, defendant makes a long list of claims.  Considered on their merits,[2]

all of his claims fail and should be summarily denied.  Defendant's central contention is that his

trial attorney, Reita Pendry, was so deficient that he did not receive a fair, reliable trial.

According to defendant, Ms. Pendry did not make specific motions and objections that defendant

wanted her to make, did not call certain witnesses, did not adequately cross-examine the

government's witnesses, did not adequately investigate the case, and conspired with the

prosecutor and the Court against him. Defendant essentially argues that if counsel had not been

---

        [2]Defendant styled his February 19, 2008 and March 27, 2008 motions as pursuant to 28
U.S.C. § 2255.  Section 2255 reads in relevant part:

        A prisoner in custody *under sentence* of a court established by Act of Congress
        claiming the right to be released upon the ground that *the sentence* was imposed in
        violation of the Constitution or laws of the United States, or that the court was
        without jurisdiction to impose *such sentence*, or that *the sentence* was in excess of
        the maximum authorized by law, or is otherwise subject to collateral attack, may
        move the court which imposed *the sentence* to vacate, set aside or correct *the
        sentence*. (Emphasis added.)

In this case, defendant has not yet been sentenced, so a motion under Section 2255 is
premature.  In the event that this Court nevertheless chooses to consider the arguments in
defendant's Section 2255 motions on their merits, defendant's arguments fail, as addressed
infra.

deficient in these and other ways, there is a reasonable probability that defendant would have been acquitted.

Ms. Pendry's affidavit, attached hereto as Exhibit 1, and the record demonstrate that Ms. Pendry's representation was able and thorough, that the evidence against defendant was overwhelming, and that defendant received a fair trial with a reliable verdict. Defendant thus has not established - as he must - that counsel's performance was deficient, nor has he established - as he also must - that, but for counsel's purportedly deficient performance, there was a reasonable probability of a different result at trial. Therefore, defendant's central claim should be summarily denied.

As for defendant's numerous other claims, they should be summarily denied because they, too, are without merit.

## BACKGROUND

On January 25, 2006, defendant was indicted in connection with the aforementioned health care fraud scheme. On February 1, 2006, a superseding indictment was returned, charging twenty-six federal offenses and criminal forfeiture.

The Honorable Emmet G. Sullivan presided over this matter. Ms. Pendry represented defendant. On March 21, 2007, the Court, after a hearing on defendant's pretrial motions, denied all of his motions (3/21/07 Tr. 132-38).[3] On March 26, 2007, the jury trial of defendant began and continued for four days. On March 29, 2007, the Court granted the government's motion to dismiss Counts 2-5 and 17-18 of the indictment (3/29/07 Tr. 33, 55). The Court denied Ms.

---

[3]"Tr." refers to the transcripts of the proceedings on March 21-30, 2007. Because the volumes are not consecutively paginated, each transcript citation is preceded by a date.

Pendry's motion for judgment of acquittal on the remaining counts (3/29/07 Tr. 34), with the result that ultimately twenty counts were submitted to the jury.

## THE MOTIONS HEARING

On November 14, 2006, defendant moved, through his counsel, to dismiss the indictment, to suppress statements, and to suppress physical evidence. Dist. Ct. PACER Docket Entry (Nov. 14, 2006). On January 8, 2007, defendant moved to treat these motions as conceded. Dist. Ct. PACER Docket Entry (Jan. 8, 2007). The government filed its opposition to the three substantive motions on January 16, 2007. Dist. Ct. PACER Docket Entry (Jan. 16, 2007). On February 14, 2007, defendant filed a motion to strike the government's opposition brief. Dist. Ct. PACER Docket Entry (Feb. 14, 2007).

## The Government's Evidence

U.S. Postal Inspector Brian Evans testified that he participated in the execution of a search warrant on December 22, 2004, beginning at 7 a.m., at defendant's apartment on 16th Street, Northwest, in Washington, D.C. (3/21/07 Tr. 18). Defendant, who was wearing white underwear when he answered the door, was handcuffed and placed in a chair in the corner of his living room (3/21/07 Tr. 20-21, 30, 34). Five or ten minutes later, once the apartment had been secured, the handcuffs were removed, and defendant was given a shirt and pants (3/21/07 Tr. 21, 36, 50). At no time was defendant completely naked (3/21/07 Tr. 21, 26). Defendant was told that he was not under arrest and was free to leave, but should not act up or do anything crazy and should remain seated in the same chair if he stayed in the apartment (3/21/07 Tr. 21, 38, 49). Defendant chose to stay and remained seated in the same chair (3/21/07 Tr. 22-23). About one hour after agents had entered the apartment, when they were ready to begin an interview, they

asked defendant if he would be willing to give a statement, and defendant voluntarily agreed to do so (3/21/07 Tr. 22, 24, 26, 50-51). Agents read defendant his Miranda rights, and defendant read and signed the IS Form 1067, Warning and Waiver of Rights Form, at 8:04 a.m. (3/21/07 Tr. 23-24, 41-42). Defendant then gave a two-hour-long interview to Inspector Evans and Special Agent Elton Malone of the Office of the Inspector General of the Department of Health and Human Services ("HHS-OIG") (3/21/07 Tr. 23-24, 42). Defendant was cooperative and spoke openly; at no time did he state that he wished to leave, that the interview should cease, or that he felt pressured to answer questions (3/21/07 Tr. 24).

All evidence that was seized during the search of defendant's apartment was taken to the U.S. Attorney's Office, including all of the driver's logs that were collected (3/21/07 Tr. 25).

### The Defense Evidence

Defendant testified that he was born in Sudan and became a U.S. citizen in 2003 (3/21/07 Tr. 53, 95). Defendant was the President and Chief Executive Officer ("CEO") of the Voice of Social Concern Association ("VSCA") (3/21/07 Tr. 89). In December 2004, defendant was living alone in an apartment on 16th Street, Northwest (3/21/07 Tr. 53-54). On December 22, 2004, at 6 a.m., defendant heard a loud knock on his door and thought it was a fire (3/21/07 Tr. 54). He was naked and opened his door with the chain still on it to check whether it was a fire (3/21/07 Tr. 54). Agents with big guns broke the chain on his door, took defendant out of his apartment, put him against the wall, handcuffed him, and told him not to move (3/21/07 Tr. 55-56, 60). After defendant spent two hours standing naked against a wall in the hallway outside his apartment, agents told him the time was 8:00 a.m., took him inside, and made him sit at his kitchen table (3/21/07 Tr. 57-58). He was still naked, and the door to his apartment was open

(3/21/07 Tr. 58).  After another ten or fifteen minutes, an agent brought him a t-shirt and a "trunk suit" to put on (3/21/07 Tr. 59).  Agent Malone and Inspector Evans told him that they would remove the handcuffs only if he signed the "warrant", so defendant signed it (3/21/07 Tr. 62, 66). The agents started asking him questions, and everybody was laughing at him (3/21/07 Tr. 63). Defendant was seated and was asked questions about health care fraud for two hours (3/21/07 Tr. 67-68).  Defendant testified that he was "afraid" of the agents and "had no choice" but to answer their questions (3/21/07 Tr. 69).  After the agents left his apartment, defendant took four photographs that reflected the condition of his apartment when they left; in defendant's opinion, the agents "trashed" his apartment (3/21/07 Tr. 71, 77-78).

Defendant further testified that Mary Khangaa was his employee "under training" and that she did some work for him in her own apartment on 15th Street, Northwest (3/21/07 Tr. 73). Defendant asked his drivers to drop off their trip logs at her apartment, and Khangaa brought them, along with her completed work, to his apartment, to which she had a key (3/21/07 Tr. 74). Defendant had no key to Khangaa's apartment, but had seen the location in her living room, which was hidden from view, where she kept his documents in an unlocked container (3/21/07 Tr. 74-75, 80).

On cross-examination, defendant testified that one of the photographs he had taken of his apartment was taken one year after the other photographs (3/21/07 Tr. 76).  Defendant did not take any photographs of the allegedly broken door chain, because he ran out of exposures and had no money to buy more film, since agents had taken the $600 he had in his wallet (3/21/07 Tr. 78, 98).  When asked if he had had sexual intercourse with Mary Khangaa, defendant stated that

a "long time ago" they were "friends", but she never gave him a key to her apartment (3/21/07 Tr. 81).

When asked by the Court whether any of his neighbors ever told him that they saw him standing naked outside his apartment that day, defendant stated that his neighbors do not talk to him anymore and are scared of him (3/21/07 Tr. 84). When asked by the Court whether he knew any of the apartment numbers of people who may have seen him standing naked outside his apartment that day, defendant testified that he knew some of their apartment numbers, but those neighbors had all moved out in the intervening two years (3/21/07 Tr. 85). Defendant testified that agents had told a building security guard to go away during execution of the search warrant, and that later defendant tried but was unable to find out who that security guard was (3/21/07 Tr. 87). Defendant insisted that he did not make the statements attributed to him in Government's Exhibit 1, the Memorandum of Interview, but at the same time he verified that most of the information in the statement was correct (see 3/21/07 Tr. 89-93, 95-97). Defendant did not allege that either Inspector Evans or Agent Malone had put words in his mouth (3/21/07 Tr. 97). Defendant confirmed that nowhere in his civil action, filed on January 30, 2006, did he state that he had been placed out in a hallway naked for two hours (3/21/07 Tr. 93-94).

Mary Khangaa testified that she was born in Tanzania and had been in the U.S. about ten years (3/21/07 Tr. 103-04). She worked for defendant from October 2003, to December 2004, as his secretary (3/21/07 Tr. 104). She kept papers related to her work for defendant in her living room (3/21/07 Tr. 106). On December 22, 2004, she heard a loud noise around 6:00 a.m. and answered her door (3/21/07 Tr. 107). Agents entered her apartment and handcuffed her, her mother, and her roommate (3/21/07 Tr. 107-08). Her baby boy was not handcuffed (3/21/07 Tr.

108).  All of the occupants of her apartment were put in the hallway and remained there in

handcuffs for about an hour (3/21/07 Tr. 109).  She may have been in handcuffs for 45 minutes

to one hour or less; she does not remember because she was very upset and crying (3/21/07 Tr.

113).  Agents brought a video camera into her apartment and taped her while she was talking

(3/21/07 Tr. 115).

On cross-examination, Khangaa testified that she kept work for Voice of Social Concern

in her living room in an unlocked desk; defendant did not have a key to her apartment (3/21/07

Tr. 110-11).  Khangaa also testified that defendant told her in January or February 2005, to lie

about this investigation (3/21/07 Tr. 110).  Specifically, defendant told Khangaa to tell the FBI

that there was a log book for drivers and that defendant taught her how to use it (3/21/07 Tr.

116).  Khangaa told defendant that she would not lie for him and that she had already told the

FBI that she knew nothing about log books for drivers (3/21/07 Tr. 116).  Defendant promised

Khangaa that if she told the FBI what defendant wanted her to say, she would never get in trouble

(3/21/07 Tr. 116-17).  Khangaa told defendant she would not change her story, and defendant

was upset and left (3/21/07 Tr. 117).

### The Government's Rebuttal Evidence

Special Agent Regina Burris of the Federal Bureau of Investigation ("FBI") testified that

she participated in executing a search warrant on December 22, 2004, at approximately 6:30 a.m.

at the residence of Mary Khangaa at 3025 15th Street, Northwest (3/21/07 Tr. 122, 125).

Khangaa and the other adults were initially placed in handcuffs and brought out into the hallway;

they were in handcuffs for five to ten minutes and in the hallway for less than ten minutes

(3/21/07 Tr. 123-24).  After the handcuffs were removed, Agent Burris and another agent

interviewed Khangaa (3/21/07 Tr. 124).  They did not ask her to sign a Miranda waiver, and

Khangaa was not under arrest (3/21/07 Tr. 125).

## The Court's Ruling

The Court denied defendant's motion to treat the motions as conceded (3/21/07 Tr. 132).

The Court then rejected defendant's version of events, specifically that he had been compelled to

stand naked out in the hallway for a significant time period, as "not as persuasive" as Inspector

Evans' testimony:

> I don't believe that these law enforcement officers required [defendant] to stand in
> the hallway handcuffed naked for the period of time that he claims he was standing
> there naked.  I just don't believe it happened that way.

(3/21/07 Tr. 134, 136-37.)  The Court reasoned that if defendant's version were true, defendant

would have set forth that version in the civil complaint that he filed (3/21/07 Tr. 134).[4]  The

Court continued

> It may well be that a jury of his peers will find to the contrary.  I don't know.  But I
> find that the law enforcement officers, both, are more credible at this point than
> either the defendant and/or his witness, a former employee.

(3/21/07 Tr. 138.)

With respect to the motion to dismiss, defense counsel acknowledged that the

government had "filled in a lot of the gaps" through its opposition brief and discovery, especially

by providing "the bulk of the trip logs" on disk (3/21/07 Tr. 138-39).  The Court denied the two

---

[4]On December 27, 2005, the Court clerk received, and on January 30, 2006, filed on
defendant's behalf, his civil complaint against the government alleging that he had been "robbed"
of his funds and vehicles.  Dist. Ct. PACER Docket Entry (06-CV-150 (EGS)) #1 (1/30/06).
Defendant's complaint contains a discussion of the search warrant executed at his residence, but
nowhere does the complaint state that defendant was forced to stand naked in the hallway during
execution of the search warrant.  Id.

motions to suppress and the motion to dismiss.  Dist. Ct. PACER Docket Entry (Mar. 22, 2007).

With respect to voir dire, the Court inquired whether the defense wished to have the

Court ask a question regarding national origin (3/21/07 Tr. 140).  Defense counsel responded, "I

don't believe so, but I want to talk to Mr. Ndoromo a little more about it" (3/21/07 Tr. 140).  No

question regarding national origin was asked during voir dire.  See generally 3/26/07 Tr. 15-22.

## THE EVIDENCE AT TRIAL

### The Government's Evidence

Defendant was the President and CEO of VSCA, a non-emergency transportation

company whose business address, 3636 16th Street, NW, Apartment B1235, Washington, D.C.

20010, also served as defendant's home (3/28/07 Tr. 50).  Effective January 10, 2001, VSCA

became an approved D.C. Medicaid transportation provider (3/26/07 Tr. 172-73).  VSCA had

two provider numbers – one for Mental Retardation and Developmental Disability

Administration Waiver Transportation and the other for Non-Emergency Transportation (3/28/07

Tr. 59).  Defendant completely controlled VSCA's bank account and signed D.C. Medicaid's

Electronic Data Interchange ("EDI") [Direct Deposit] Enrollment Application (Government

Exhibit ("Govt. Ex.") 6) as VSCA's Chief Financial Officer/Authorized Representative (3/26/07

Tr. 169, 176).

As of July 3, 2003, Medicaid reimbursed transportation providers $33 per round-trip for

ambulatory van transportation inside the Capital Beltway with an extra assistant, or $27.50 per

round-trip without an extra assistant  (3/26/07 Tr. 177-78; Govt. Ex. 12).  During the time that

VSCA was an approved, D.C. Medicaid transportation provider, defendant owned or operated

two to five vans and employed two to five drivers (3/26/07 Tr. 175; 3/27/07 Tr. 17, 56, 175-76).

10

In order to receive reimbursements from Medicaid, defendant was required to maintain a "Daily Transportation Log" or drivers' log (3/26/07 Tr. 183; 3/28/07 Tr. 12, 76).[5] Defendant was also required to obtain prior authorization for each trip (3/28/07 Tr. 71, 74-75, 80; Govt. Ex. 2). Defendant regularly signed claims purporting to document transportation services provided to beneficiaries and submitted them to a private billing company retained by D.C. Medicaid (3/27/07 Tr. 68-69). D.C. Medicaid, in turn, sent checks in the amount of the claim via the U.S. Mail to VSCA at defendant's residence or by wire directly to VSCA's Bank of America checking account (3/28/07 Tr. 120-21).

D.C. Medicaid paid defendant approximately $110,331.75 in 2001, $330,456.89 in 2002, $577,256.82 in 2003, and $844,968.75 in 2004, for transportation services, for a total of approximately $1,863,014.21 (3/28/07 Tr. 125-26; Govt. Ex. 19). D.C. Medicaid records indicate that these totals made defendant one of the highest paid providers of transportation services in D.C. by over one million dollars (3/28/07 Tr. 27). Because Medicaid purposely set up the system to evenly divide the trips among transportation providers, no company should have made significantly more money than any other (3/26/07 Tr. 179-80).

---

[5]It appears that defendant created fraudulent driver's logs that bore the purported signature of his driver Michael Rajj, but that Mr. Rajj testified he did not sign (3/27/07 Tr. 21-24; Govt. Exs. 49, 50). Also, in the two months before the FBI executed a search warrant at Mary Khangaa's apartment, a driver began to drop off driver's logs at Khangaa's apartment, according to Ms. Khangaa's testimony, but, based on her instructions from defendant, she never referred to such logs when preparing the Medicaid claims forms, HICF 1500 (3/27/07 Tr. 78-79). Instead, she always used the master list of alleged clients that defendant had provided to her (3/27/07 Tr. 70-71). A month or two after the FBI executed a search warrant at Khangaa's apartment, defendant asked Khangaa to lie for him and tell the FBI that she had used the log books to do her work, when, in fact, he had never taught her how to use them (3/27/07 Tr. 84-85).

11

Because VSCA was one of the highest paid providers, investigators with the HHS-OIG and the Medical Assistance Administration ("MAA") conducted an audit of VSCA in 2004 (3/27/07 Tr. 185). As part of the audit, defendant was asked to provide his driver's logs, but failed to do so (3/27/07 Tr. 196-99).

Further investigation revealed that many of the Medicaid beneficiaries for whom defendant billed Medicaid never received the transportation services claimed by defendant (see, e.g., 3/27/07 Tr. 118, 123-24). Some had been pronounced dead prior to the purported dates of service or were in jail on the purported dates of service (3/28/07 Tr. 95, 143-44). In other cases, the beneficiaries had used defendant's van service only a few times, but defendant made Medicaid claims amounting to thousands of dollars for these beneficiaries after they stopped using the service (3/27/07 Tr. 123-24; 3/28/07 Tr. 32, 38).

Many of defendant's supposed Medicaid clients, particularly those for whom VSCA billed large amounts, were ex-heroin users whom defendant purportedly or actually transported to methadone clinics (3/27/07 Tr. 18-20, 27, 33-40). According to Medicaid, there was one "pilot program" that permitted transportation to one methadone clinic, PIDARC (3/27/07 Tr. 9; 3/28/07 Tr. 68). A review of the beneficiaries defendant allegedly transported to methadone clinics revealed only one authorized beneficiary (Govt. Ex. 163). With respect to the other beneficiaries defendant claimed to have transported, defendant did not have authorization for the trips for which he billed Medicaid: Some of the beneficiaries were not entitled to transportation because they could walk (3/27/07 Tr. 126); some were not authorized to be transported by VSCA; and

12

some were not transported as many times as defendant claimed (3/28/07 Tr. 153).[6]  The total

number of trips for which defendant obtained prior authorizations was 180 – even though he

billed for 62,631 trips (see Govt. Ex. 158) – and the total amount of money defendant received

from D.C. Medicaid for the authorized trips, assuming $33 per round-trip, was only $5,940 of the

over $1.8 million he received (Govt. Ex. 163).

On December 20, 2004, law enforcement agents presented U.S. Magistrate Judge John J.

Facciola with a warrant to search defendant's home/office at 3636 16th Street, NW, Washington,

D.C., and warrants to seize property illegally obtained, all of which Judge Facciola signed

(3/29/07 Tr. 11).  On December 21, 2004, money was seized from defendant's bank accounts

pursuant to the warrants (3/28/07 Tr. 151, 3/29/07 Tr. 12-13).  On December 22, 2004, agents

executed the warrant on defendant's home/office (3/29/07 Tr. 10).[7]

### The Defense Evidence

Defendant did not take the stand, but called one witness to impeach Mary Khangaa's

testimony in the government's case in chief.  Agent Burris testified that agents executed a search

warrant at Khangaa's residence on December 22, 2004, and interviewed her (3/29/07 Tr. 40).  At

first, Khangaa seemed to state that she used driver's logs or daily forms to complete the HICF

---

[6]Contrary to the Medicaid rule requiring transportation requests to come from Medicaid, social workers, nurses, or caseworkers, defendant instructed his drivers to fill out a form (Govt. Ex. 24) when a prospective client directly requested transportation and to transmit the patient's identifying information to defendant or his secretary, Mary Khangaa (3/27/07 Tr. 27-29, 58-59, 152, 173; 3/28/07 Tr. 78).  Defendant also asked a client to recruit other clients for him and paid her to do so (3/27/07 Tr. 129-33; Govt. Ex. 130).  These actions violated Medicaid's explicit policy prohibiting transportation providers from marketing their services to Medicaid recipients (3/28/07 Tr. 90-91).

[7]Agents also executed a search warrant on December 22, 2004, at Mary Khangaa's residence and interviewed Khangaa (3/29/07 Tr. 11, 40).

1500's (the Medicaid claims forms) (3/29/07 Tr. 42-43).  Later in the interview, Khangaa stated

that she used the "master list," which defendant had given to her, to bill Medicaid on the HICF

1500's and that the driver's daily forms were only used to pay the drivers (3/29/07 Tr. 43-44, 49).

Khangaa also told agents that she had entered the U.S. on a student visa which had expired, and

that she was applying for a green card and citizenship (3/29/07 Tr. 46-47).[8]  Khangaa further

stated that not all of the clients transported by VSCA had authorization numbers and that she

completed the HICF 1500's in advance, before service was rendered (3/29/07 Tr. 48-49).

## VERDICT

On March 30, 2007, a jury found defendant guilty of twenty offenses relating to

defendant's scheme to defraud the District of Columbia's Medicaid program (3/30/07 Tr. 12-16).

Defendant was detained pending sentencing.  Dist. Ct. PACER Docket Entry (Mar. 30, 2007).

On April 2, 2007, the jury returned a verdict forfeiting over $1.8 million and two vehicles.  Dist.

Ct. PACER Docket Entry (Apr. 2, 2007).

## POST-CONVICTION EVENTS

Sentencing was originally scheduled for June 22, 2007.  Dist. Ct. PACER Docket Entry

#59 (Apr. 2, 2007).  Sentencing has since been repeatedly postponed, and there is no current

sentencing date.  Rather, the district court has currently scheduled for June 18, 2008, a hearing on

defendant's post-trial motions.  Dist. Ct. PACER Docket Entry (Feb. 27, 2008).  In the interim,

defendant has filed no fewer than ten pleadings and has changed attorneys several times.  See

generally Dist. Ct. PACER Docket.

---

[8]In the government's case, Khangaa had testified that she told the agents on December 22,
2004, that she was in the U.S. on a work visa, not a student visa (3/27/07 Tr. 94-96).

14

On June 1, 2007, defendant filed pro se a motion to dismiss the indictment and a motion to dismiss all charges due to prosecutorial misconduct. Dist. Ct. PACER Docket Entry ##48-49. This Court issued a written order denying without prejudice both motions. Dist. Ct. PACER Docket Entry #51 (filed June 4, 2007).

On August 20, 2007, defendant filed pro se a motion seeking release pending the filing of post-trial motions. Dist. Ct. PACER Docket Entry #56. The Court denied defendant's motion without prejudice in open court on September 5, 2007. Dist. Ct. PACER Docket Entry (Sept. 5, 2007). The Court subsequently issued a written order to the same effect. Dist. Ct. PACER Docket Entry #58 (filed Sept. 7, 2007).

On September 14, 2007, defendant filed pro se a Motion to Reverse the Conviction Due to Ineffective Attorney and Government's Violations of Sixth Amendment. Dist. Ct. PACER Docket Entry # 60.[9]

Defendant filed another motion for release, through counsel, on September 26, 2007. Dist. Ct. PACER Docket Entry #62. The district court denied defendant's motion in open court on October 24, 2007. Dist. Ct. PACER Docket Entry. On November 7, 2007, defendant filed pro se a motion for release. Dist. Ct. PACER Docket Entry #65. The motion was treated as a notice of appeal from the Court's ruling of October 24, 2007 (id.), and docketed in the D.C. Circuit on December 27, 2007. On February 22, 2008, the D.C. Circuit affirmed this Court's denial of defendant's motion for release. Dist. Ct. PACER Docket Entry #88 (filed April 21, 2008).

---

[9]On February 15, 2008, the Court ordered the government to respond to this motion by March 17, 2008. Dist. Ct. PACER Docket Entry (Feb. 15, 2008). On February 27, 2008, the Court extended this deadline to May 9, 2008. Dist. Ct. PACER Docket Entry (Feb. 27, 2008).

On January 10, 2008, defendant filed pro se a Motion for Recusal of Judge Sullivan. Dist. Ct. PACER Docket Entry #75.  The Court denied defendant's motion in open court on February 15, 2008.  Dist. Ct. PACER Docket Entry.

On February 19, 2008, defendant filed pro se a Motion to Vacate Federal Conviction and Detention under 28 U.S.C. 2255.  Dist. Ct. PACER Docket Entry #78.

On March 19, 2008, defendant filed pro se two Petitions for Writ of Mandamus for Immediate Recusal of Judge Emmet G. Sullivan.  Dist. Ct. PACER Docket Entry ##80 and 81. On April 7, 2008, one of these petitions was dismissed by the Federal Circuit for lack of jurisdiction.  Dist. Ct. PACER Docket Entry #87 (filed April 8, 2008).

On March 20, 2008, defendant submitted pro se, and on April 2, 2008, the Court clerk filed on defendant's behalf, a notice of appeal from his pending motion to vacate under 28 U.S.C. § 2255, filed on February 19, 2008.  Dist. Ct. PACER Docket Entry #86.

On March 27, 2008, defendant filed pro se another motion to vacate under 28 U.S.C. § 2255.  Dist. Ct. PACER Docket Entry #83.

## ARGUMENT

Section 2255 permits a prisoner in custody under sentence of a federal court to move the sentencing court to vacate, set aside, or correct a sentence.  28 U.S.C. § 2255 (emphasis added). Defendant has not yet been sentenced in this case, so his motions under Section 2255 are premature.  Even if he had already been sentenced, to gain relief under Section 2255 defendant must show "a good deal more than would be sufficient on a direct appeal from his sentence." United States v. Pollard, 959 F.2d 1011, 1020 (D.C. Cir.), cert. denied, 506 U.S. 915 (1992).

Defendant carries the burden of "sustaining his contentions by a preponderance of the evidence." Smith v. United States, 2005 WL 1313445, *2 (D.D.C. June 1, 2005).

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgement and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33.  In this brief, we respond to defendant's three motions as if they were properly filed under Rule 33.

We demonstrate below that, based on the record in this case, defendant's many claims should be summarily denied.  More specifically, in Part I, we summarize defendant's claims.  In Part II, we discuss defendant's ineffective assistance claim and explain that defendant has not established that his trial counsel was deficient or that, but for this purported deficiency, the result at trial would have been different.  In Part III, we discuss defendant's remaining claims and explain why they are without merit.  Finally, in Part IV, we explain why an evidentiary hearing is not necessary.

## I.    Defendant's Claims

### A.    Claims Raised in Defendant's September 14, 2007 Motion

Defendant's pro se September 14, 2007 motion raises what we will refer to as Claims A-G:[10]

(A)    Ineffective Assistance of Counsel: His attorney was ineffective in that she purportedly:

    1)    did not move to dismiss the case when the government failed to meet a pretrial motions deadline (9/14/07 Motion at 2-3);

---

[10]We have attempted to liberally construe defendant's pro se claims in this voluminous motion and in his other two pro se pleadings.  If the Court determines defendant has raised claims unaddressed by the government, we respectfully request clarification of those claims from the Court and/or defense counsel and an opportunity to address any such claims.

2)      did not file a motion to suppress evidence that was allegedly beyond the scope of the search warrant, e.g., VSCA's 2000 tax return (id. at 3, 17);

3)      did not subpoena unnamed witnesses for the motions hearing (id. at 3);

4)      did not cross-examine an unnamed former "Health Care Department Auditor" (id. at 4);

5)      secretly revealed the defense's trial strategy to the prosecutor pretrial (id. at 4);

6)      blocked defendant from access to his seized files (id. at 4, 16);

7)      did not lay a foundation for and introduce allegedly exculpatory evidence (id. at 4);

8)      did not object to charts introduced by the government (id. at 5);

9)      did not object to or move for a mistrial after the government's opening statement (id. at 5-6);

10)     had an unspecified conflict of interest and "relationship" with the government (id. at 5, 7, 12);

11)     did not adequately investigate and develop unspecified mitigating evidence (id. at 5-6);

12)     did not move to dismiss the "fatally defective indictment" (id. at 6);

13)     did not object to evidence regarding defendant's character (id. at 6);

14)     did not obtain videotaped evidence from the government (id. at 7);

15)     did not move to dismiss the case based on unspecified Fifth Amendment violations (id. at 7);

16)     did not cross-examine Brian Evans, a government witness (id. at 7);

17)     did not object to or move for a mistrial after the government's closing argument (id. at 7, 12);

18)     did not object to the government's failure to disclose alleged Brady information, e.g., all of the trip logs in defendant's name and "clients received forms" (id. at 7-8);

19)     did not object to allegedly insufficient evidence of health care fraud (id. at 8);

20)     made unspecified false representations to the Court (id. at 9);

21)     "leaked" an alleged list of eight defense witnesses to the government (id. at 9);

22)     took no action to halt the "vindictive prosecution" of defendant and alleged prosecutorial misconduct (id. at 11-12, 14);

23)     did not move for acquittal based on the government's alleged failure to prove that defendant's conduct was knowing and intentional (id. at 15);

24)     convinced defendant's subsequent attorney, Pleasant Broadnax, to be ineffective (id. at 16);

25)     did not take any further action after alerting the Court that two individuals had been illegally using VSCA's Medicaid provider number (id. at 17-18);

26)     did not call Katrina Foster as a witness to rebut the government's evidence that Ms. Foster was in jail during the time period that defendant billed Medicaid for transporting her to doctor's appointments (id. at 18).

(B)    <u>Government Misconduct</u>: Defendant was denied a fair trial because the government allegedly:

    1)    intruded in the attorney-client relationship in unspecified ways (<u>id.</u> at 8, 10, 16);

    2)    made prejudicial remarks during opening and closing statements about defendant's race and national origin and stated that defendant does not help his own employees (<u>id.</u> at 12-13);

    3)    introduced VSCA's 2002 tax return at trial (<u>id.</u> at 14);

    4)    made prejudicial comments regarding defendant's former girlfriend (<u>id.</u> at 14);

    5)    called for revocation of defendant's bond even though the government allegedly "knew" that the indictment was defective and the evidence insufficient (<u>id.</u> at 16-17).

(C)    <u>Insufficiency of the Evidence</u>: The evidence allegedly did not support defendant's convictions because the government failed to sustain its burden of proof on four "elements" and failed to prove defendant's conduct was knowing and intentional (<u>id.</u> at 14-15).

(D)    <u>Constitutional Violations</u>: The government purportedly violated defendant's Fourth, Fifth, Sixth, and Fourteenth Amendment rights (<u>id.</u> at 9, 13):

    1)    The government violated defendant's Fourth Amendment rights by exceeding the scope of the search and seizure warrants, seizing defendant for four hours, and using VSCA's 2000 tax return, even though it was beyond the scope of the search warrant (<u>id.</u> at 10, 17).

    2)    The government violated defendant's Sixth Amendment rights by seizing all of the funds in his bank accounts, thereby preventing him from obtaining effective representation (<u>id.</u> at 13).

    3)    The government violated defendant's Fourth, Fifth, and Fourteenth Amendment rights by making references to Sudan even though defendant is a U.S. citizen (<u>id.</u> at 13).

    4)    The government violated defendant's Due Process rights by seizing his property, then waiting 14 months to indict him (<u>id.</u> at 15).

(E)    <u>Court Bias</u>: The Court demonstrated prejudice against defendant because defendant is from Sudan (<u>id.</u> at 9, 17-18).

(F)    <u>Vindictive Prosecution</u>: The government prosecuted defendant because:

    1)    he was helping children in Africa (<u>id.</u> at 10);

    2)    he refused to give half his money to the government, after the government allegedly harassed him to do so, and instead filed a civil lawsuit seeking return of his money and property (<u>id.</u> at 10-11);

3)    he failed to accept the post-indictment plea offer (id. at 11).

(G)    Equal Protection Violation: The Equal Protection clause was violated by "community discrimination" in the selection of the jury (id. at 19).

## B.    Defendant's Claims in His February 19 and March 27, 2008 Motions

In his pro se Section 2255 motions filed on February 19, 2008, and March 27, 2008,

defendant raises many of the same baseless allegations noted in his September 14, 2007 motion.

We will refer to the claims in his Section 2255 motions as Claims 1-9:[11]

(1)    Ineffective Assistance of Counsel: His counsel was ineffective because she purportedly had an unspecified conflict of interest and "relationship" with the government (2/19/08 Motion at 13-14).

(2)    Constitutional Violations:

a)    Defendant's Fifth and Sixth Amendment rights were allegedly violated by the trial ending without defendant presenting the "second phase of the trial" (id. at 1, 8).

b)    Defendant's Fourth, Fifth, and Sixth Amendment rights were violated by the government's purported seizure of defendant's bank accounts using "illegal warrants" (id. at 2).

c)    The government violated defendant's Fourth, Fifth, and Fourteenth Amendment rights by making references to Sudan even though defendant is a U.S. citizen (id. at 12).

d)    The government violated defendant's Fourth Amendment rights on December 22, 2004, by seizing him without an arrest warrant and by seizing documents that were beyond the scope of the search and seizure warrants (id. at 14-16).

(3)    Government Misconduct: Defendant was denied a fair trial because the government relied on the allegedly perjured testimony of Brian Evans (id. at 3), introduced VSCA's 2002 tax return (id. at 12), and made prejudicial remarks during jury selection, opening statements, and questioning of witnesses, e.g., by referring to the $1.8 million that defendant took, defendant's country of origin (Sudan), defendant's failure to help his own employees, and defendant's former girlfriend (id. at 10-13).

(4)    Vindictive Prosecution: The government prosecuted defendant because defendant had filed a civil suit against the government and the government wanted to conceal that it was

---

[11]The claims in the 2/19/08 and 3/27/08 motions are nearly identical, so we cite only to the 2/19/08 motion.

"under investigation" for "illegally" intercepting VSCA's funds and that a doctor and nurse were under investigation for using VSCA's Medicaid provider number (id. at 3).

(5)    Court Error: The Court erred in denying defendant's motions to suppress evidence and to dismiss the indictment (id. at 3-5, 8-10).

(6)    Conspiracy: The Court, the government, and defense counsel conspired against defendant by, e.g., preventing the jury from seeing the indictment and revising the jury instructions (id. at 4, 6-7).

(7)    Voir Dire/Court Bias Claim: The Court demonstrated hatred of Sudanese/Africans by suggesting that perhaps the Court should ask a voir dire question regarding national origin (id. at 5).

(8)    Insufficiency of the Evidence: The government failed to sustain its burden of proof on three "elements" and, thus, defendant should have been acquitted (id. at 16-17).

(9)    Equal Protection Violation: The Equal Protection clause was violated by the government's "discriminatory administration of valid statutes" in this case (id. at 17).

## II.    Defendant Has Not Demonstrated Ineffective Assistance of Counsel

As discussed above, defendant's ineffective assistance claims under Section 2255 are premature because defendant has not yet been sentenced. Even if the Court determines that all of defendant's ineffective assistance claims are timely, his claims should nonetheless be denied.

### A.    Legal Principles

The Sixth Amendment guarantees the right to effective assistance of counsel. Strickland v.. Washington, 466 U.S. 668, 686 (1984). "This right has been accorded . . . 'not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.'" Mickens v. Taylor, 535 U.S. 162, 166 (2002) (quoting United States v. Cronic, 466 U.S. 648, 658 (1984)). A claim that counsel's assistance was so defective as to require a new trial has two components. Defendant must demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland,

21

466 U.S. at 687. Second, he must establish that his counsel's deficient performance prejudiced him. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Id. at 700.

## B. Defendant Has Not Established Prejudice

"If it is easier to dispose of an ineffectiveness claim on the ground of a lack of sufficient prejudice, which . . . will often be so, that course should be followed." Id. at 697. We thus turn first to prejudice. To show prejudice, defendant must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding, if the error had no effect on the judgment." Id. at 691. In assessing whether defendant has shown prejudice, the Court must consider the totality of the evidence presented to the jury. Id. at 695.

The government's proof of defendant's guilt was overwhelming. Inter alia, the evidence showed the following:

- Janet Burness, a Medicaid recipient, died on March 10, 2004 (3/28/07 Tr. 142; Govt. Ex. 96). Yet, defendant billed Medicaid $1,452.00 for allegedly transporting Ms. Burness numerous times between March 11, 2004, and May 19, 2004 (3/28/07 Tr. 142; Govt. Ex. 102).

- Brenda Boyd, a Medicaid recipient, died on December 1, 2003 (Govt. Ex. 89). Yet, defendant billed Medicaid $4,620.00 for allegedly transporting Ms. Boyd numerous times between December 2, 2003, and April 21, 2004 (3/28/07 Tr. 141; Govt. Ex. 94).

- Sterling Smith, a Medicaid recipient, died on October 28, 2004 (3/28/07 Tr. 143; Govt. Ex. 123). Yet, defendant billed Medicaid $594.00 for allegedly transporting Mr. Smith

numerous times between October 29, 2004, and November 15, 2004 (3/28/07 Tr. 143-44;
Govt. Ex. 124).

• Katrina Foster, a Medicaid recipient, was incarcerated from March 5, 2003, to March 10,
2004 (Govt. Ex. 87).  Yet, defendant billed Medicaid $8,304.00 for allegedly transporting
Ms. Foster numerous times during that precise time period (3/28/07 Tr. 141; Govt. Ex.
88).

• Cornelius Knowlton, a Medicaid recipient, testified that he provided his Medicaid
number to a transportation service, the name of which he could not remember, in 2003,
because he had a hip replacement and required transportation for three sessions of
rehabilitation (3/27/07 Tr. 121-25).  Yet, defendant billed Medicaid $23,166.00 for
allegedly transporting Mr. Knowlton 380 times between September 23, 2002, and
November 15, 2004 (3/28/07 Tr. 142; Govt. Ex. 108).  Knowlton testified that he does
not even use the Metro that often (3/27/07 Tr. 124).

• Sylvia Ann Smith, a Medicaid recipient, testified that she always received transportation
to her appointments at PIDARC from the Olamac transportation company; she had never
received transportation from – or even heard of – the Voice of Social Concern
Association or Akube Ndoromo James (3/27/07 Tr. 116-20).  Yet, defendant billed
Medicaid $13,908.00 for allegedly transporting Ms. Smith numerous times between
March 6, 2003, and November 15, 2004 (3/28/07 Tr. 137-38; Govt. Ex. 115).

• Lynette Turner, a Medicaid recipient, testified that she received transportation from
defendant/VSCA in 2001 and 2002, but stopped receiving transportation from
defendant/VSCA when she went to Anchor Mental Health in 2002 (3/28/07 Tr. 31-34).
Nikki Horne, Ms. Turner's case manager at Anchor Mental Health in 2004 and 2005,
testified that in 2002, Anchor hired assistants to help the case managers transport clients;
the assistants or case managers would transport clients in a company van or their personal
vehicles (3/28/07 Tr. 35-38).  Yet, defendant billed Medicaid $13,602.00 for allegedly
transporting Ms. Turner numerous times from February 13, 2002, to March 3, 2004
(3/28/07 Tr. 135-36; Govt. Ex. 80).

In addition to these witnesses and documents, the jury saw numerous documents

recovered from defendant's apartment that clearly stated the rules for Medicaid transportation

providers: they could only transport people who were physically unable to take regular

transportation; they needed to obtain a prior authorization code for each trip (or a standing

authorization for a number trips for a specific recipient); they had to maintain driver's logs; and

23

they could not recruit new clients. And the jury heard about how defendant blatantly and

repeatedly violated each of these rules. For example, defendant billed Medicaid for transporting

Gwendolyn Moore, who testified that she was able to walk during the time period that VSCA

transported her to the PIDARC methadone clinic (3/27/07 Tr. 126). Defendant obtained prior

authorization codes for only 180 out of the 62,631 trips – approximately $6,000 out of the $1.8

million – for which he billed Medicaid (Govt. Exs. 158, 163). Defendant did not maintain and

base his billings on driver's logs as he was supposed to do; instead he provided Mary Khangaa

with a master list of alleged clients and instructed her to use that list when filling out the

Medicaid claims forms (3/27/07 Tr. 70-71). And defendant paid a client to recruit other clients

(3/27/07 Tr. 129-33) and instructed his drivers to record and transmit the identifying information

of any prospective clients who requested transportation (3/27/07 Tr. 27-29, 58-59, 152, 173;

3/28/07 Tr. 78). The jury also heard about the great disparity between the amount of money

defendant paid his drivers – based on the number of clients actually transported – and the

exponentially higher amount of money he claimed and received from Medicaid, in large part for

clients never transported and trips never taken.

"[A] verdict or conclusion only weakly supported by the record is more likely to have

been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at

696. Here, in light of the "overwhelming" proof of his guilt, none of the alleged deficiencies

about which defendant complains were so significant that the jury "would have had a reasonable

doubt respecting guilt." Id. at 695.

Hence, defendant has not shown prejudice. See Hicks v. Collins, 384 F.3d 204, 215 (6th

Cir. 2004) (because there was "overwhelming evidence of [defendant's] guilt," he "cannot"

24

demonstrate prejudice under Strickland), cert. denied, 544 U.S. 1037 (2005); United States v.

Roane, 378 F.3d 382, 405 (4th Cir. 2004) (in light of the "overwhelming evidence" against them,

defendants did not show prejudice), cert. denied, 546 U.S. 810 (2005); United States v. Moore,

104 F.3d 377, 391 (D.C. Cir.1997) (where evidence against defendant was very strong, attorney's

purported error in failing to call a witness was harmless); United States v. Hubbard, 22 F.3d

1410, 1422 (7th Cir. 1994) (overwhelming evidence of defendant's guilt "prevents him from

meeting the high prejudice standard of Strickland"), cert. denied, 513 U.S. 1095 (1995); United

States v. Royal, 972 F.2d 643, 651 (5th Cir. 1992) ("[t]he overwhelming evidence of the

Defendant's guilt further supports our conclusion that he suffered no prejudice as a result of his

counsel's performance"), cert. denied, 507 U.S. 911 (1993).

   Defendant nonetheless asserts - in starkly conclusory terms - that he was prejudiced by

Ms. Pendry's many purported failings.  To highlight several of his claims, he protests that Ms.

Pendry should have moved to dismiss the case when the government failed to meet a pretrial

deadline for filing oppositions to defendant's motions (9/14/07 Motion at 2-3), but does not

explain how the government's failure would have justified dismissal of the entire case and

ignores that counsel did file both a Motion to Treat Motions as Conceded on January 8, 2007

(Dist. Ct. PACER Docket Entry #26) and Defendant's Motion to Strike Government's

Opposition to Defendant's Motions on February 14, 2007 (Dist. Ct. PACER Docket Entry #29).[12]

 Defendant asserts that Ms. Pendry should have filed a motion to suppress evidence that was

allegedly beyond the scope of the search warrant (9/14/07 Motion at 3, 17), but ignores that

---

[12]The Court denied these motions at the end of the hearing on March 21, 2007 (3/21/07
Tr. 132).

25

counsel did file a Motion to Suppress Physical Evidence on November 14, 2006 (Dist. Ct. PACER Docket Entry #17), and argued therein that the seizure of evidence during execution of the search warrant exceeded the scope authorized under the warrant (11/14/06 Motion ¶ 4).[13] Defendant claims that Ms. Pendry should have subpoenaed important fact witnesses for the motions hearing (9/14/07 Motion at 3), but does not offer any basis for believing that these unnamed witnesses would have testified that he was naked during execution of the search warrant. Defendant asserts that Ms. Pendry should have cross-examined an unnamed "former Health Care Department Auditor" (9/14/07 Motion at 4), but does not explain how "impeach[ment]" of this unnamed witness on the basis that she is no longer working there would have changed the result at trial and ignores that counsel effectively cross-examined all of the government witnesses who vaguely fit this description.[14] Defendant alleges that Ms. Pendry secretly revealed the defense's trial strategy to the prosecutor pretrial (9/14/07 Motion at 4), but does not explain their trial strategy, state any basis for his allegation that Ms. Pendry revealed their "plans to win this case," or explain what the prosecutor learned that undercut the defense's strategy in any material respect.

---

[13]The Court denied this motion at the end of the hearing on March 21, 2007 (3/21/07 Tr. 132-38).

[14]Ms. Pendry thoroughly cross-examined Felicia Rowe, who worked for D.C. Medicaid from January 2002 to April 2006, first as the provider enrollment supervisor, then transportation supervisor, then provider services supervisor, then claims manager (3/26/07 Tr. 163, 191-202 (cross); 3/27/07 Tr. 8-12 (more cross)). Ms. Pendry also extensively cross-examined Gloria Watson, who has been working for D.C. Medicaid as a nurse consultant with the surveillance and utilization review unit, which audits providers, since 2002 (3/27/07 Tr. 184-85; 3/28/07 Tr. 6-21 (cross), 29-30 (re-cross). Furthermore, Ms. Pendry effectively cross-examined Patricia Squires, the deputy chief of program operations at D.C. Medicaid since approximately 2002 (3/28/07 Tr. 56-57, 95-115 (cross)).

In sum, defendant's conclusory assertions of prejudice are insufficient.  See, e.g., 9/14/07 Motion at 6 ("[A]bsent counsel's error there was high probability outcome would have [been] different").  Because defendant has not demonstrated prejudice, his ineffective assistance claim fails.

### C.     Defendant Has Not Shown That Ms. Pendry's Performance Was Deficient

Defendant also has failed to establish that Ms. Pendry's performance was deficient. "Judicial scrutiny of counsel's performance must be highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.

Ms. Pendry's affidavit, attached hereto as Exhibit 1, and the record demonstrate that Ms. Pendry capably represented defendant.  Numerous pretrial motions were filed.[15]  Ms. Pendry obtained the Court's permission to hire an investigator to interview government witnesses, clients transported by VSCA, Medicaid officials, and medical services providers (see Ex Parte Motion for Leave to Hire Investigator, Dist. Ct. PACER Docket Entry #18 (Nov. 15, 2006)).  Ms. Pendry also obtained the Court's permission to hire a paralegal to review and summarize the

---

[15]Counsel for defendant filed a Motion to Dismiss Indictment (Dist. Ct. PACER Docket Entry #15 (Nov. 14, 2006)); Motion to Suppress Statements (Dist. Ct. PACER Docket Entry #16 (Nov. 14, 2006)); Motion to Suppress Physical Evidence seized from defendant's and Mary Khangaa's residences (Dist. Ct. PACER Docket Entry #17 (Nov. 14, 2006)); Motion to Treat Motions as Conceded (Dist. Ct. PACER Docket Entry #26 (Jan. 8, 2007)); and Defendant's Motion to Strike Government's Opposition to Defendant's Motions (Dist. Ct. PACER Docket Entry #29 (Feb. 14, 2007)).

"thousands of documents" provided by the government as discovery (see Ex Parte Motion for Leave to Obtain Paralegal Services, Dist. Ct. PACER Docket Entry #19 (Nov. 15, 2006)).

The record shows that Ms. Pendry knew the case well. She made key objections.[16] She employed classic defense strategies of attacking the credibility and veracity of the government's witnesses and attempting to divert the jury's attention from defendant's fraud to Medicaid's mistakes.[17] The former strategy was particularly well-suited for government witnesses such as Mary Khangaa, who had worked for defendant and testified on direct examination in a way that was not entirely consistent with her previous statements to the FBI. Ms. Pendry subjected Ms.

---

[16]For example, by vigorously objecting on hearsay grounds to the admission of a printout of a computerized record from the Department of Corrections regarding Katrina Foster (Govt. Ex. 87), Ms. Pendry almost succeeded in keeping the jury from learning the dates of Ms. Foster's incarceration and how they overlapped with the dates on which VSCA claimed to have transported her (3/29/07 Tr. 27-31). In the end, the government was able to bring in a custodian of records to testify, and, despite Ms. Pendry's vigorous cross-examination of that witness, the record was admitted (3/29/07 Tr. 57-67).

[17]Ms. Pendry elicited during her effective cross-examination of the government's witnesses that some health care providers had used defendant's allegedly unique Medicaid provider number (3/28/07 Tr. 97-99) and that although prior authorization numbers were supposedly required for payment of claims, numerous claims were paid without prior authorization numbers (3/28/07 Tr. 102). Ms. Pendry then used this testimony to argue in closing that the evidence from Medicaid could not be trusted and that their system was flawed (3/29/07 Tr. 86-90).

Khangaa to persistent, thorough cross-examination.[18]  And Ms. Pendry continued her efforts on

defendant's behalf after the trial concluded.[19]

The entire record thus demonstrates that Ms. Pendry vigorously and effectively

represented defendant.  On this record, defendant has not shown that counsel's performance was

deficient, and his ineffective assistance claim fails.

Defendant disagrees.  With the benefit of hindsight, he raises a long list of complaints

about Ms. Pendry.  However, "there are countless ways to provide effective assistance in any

given case," Strickland, 466 U.S. at 688, and "[t]he Sixth Amendment guarantees reasonable

competence, not perfect advocacy judged with the benefit of hindsight."  Yarborough v. Gentry,

540 U.S. 1, 6 (2003).  Nonetheless, to the extent that we have not discussed defendant's specific

claims alleging Ms. Pendry's purported failings, we do so now.

**D.**      **Defendant Has Not Shown That Counsel's Performance Was Ineffective**

       **1.**      **The Record Shows That Ms. Pendry Adequately Investigated and Developed a Defense**

Several of defendant's claims are premised on the assumption that Ms. Pendry failed to

adequately investigate the case and develop a defense.  For example, defendant claims that Ms.

Pendry failed to subpoena unnamed witnesses for the motions hearing, develop unspecified

---

[18]During her vigorous cross-examination of Ms. Khangaa (3/27/07 Tr. 85-111), Ms.
Pendry locked in Ms. Khangaa's statements on direct examination that she had never told the FBI
that she used trip logs to prepare the Medicaid claims forms that were submitted for payment
(3/27/07 Tr. 85, 89) and that she had never told the FBI that she had come to the U.S. on a
student visa (3/27/07 Tr. 94).  Ms. Pendry was then able to impeach Ms. Khangaa during the
defense case through the testimony of FBI Special Agent Regina Burris (see 3/29/07 Tr. 42-47).

[19]On April 25, 2007, she filed a Motion for Extension of Time to File New Trial Motion
(Dist. Ct. PACER Docket Entry #44).

mitigating evidence, introduce allegedly exculpatory evidence, and call a particular witness at

trial (9/14/07 Motion at 3-7, 17-18).  The record and Ms. Pendry's affidavit (Exhibit 1 hereto)

contradict these claims.

As mentioned supra, defendant claims that Ms. Pendry should have subpoenaed

important fact witnesses for the motions hearing (9/14/07 Motion at 3), but does not offer any

basis for believing that these unnamed witnesses would have testified that he was naked during

execution of the search warrant.  As Ms. Pendry's affidavit makes clear, Ms. Pendry's

investigator found no witnesses who would have stated that (Pendry Aff. ¶ 5).  Ms. Pendry's

investigator interviewed defendant's neighbors, who stated that they recalled the execution of the

search warrant in defendant's apartment but were unable to see defendant during that event

(Pendry Aff. ¶ 5).  The investigator also interviewed the building's security guards, who were

working on the day of the search warrant and still working there at the time of the interviews,[20]

and they stated that once the agents arrived to execute the search warrant, the guards were not

allowed upstairs and thus could not see defendant (Pendry Aff. ¶ 5).  "[C]ounsel's decision to call

a particular witness 'is a tactical decision and, thus, a matter of discretion for trial counsel.'"

United States v. Alexander, 3 F.3d 1577, *1 (D.C. Cir. 1993) (quoting United States v. Glick,

710 F.2d 639, 644 (10th Cir.1983), cert. denied, 465 U.S. 1005 (1984)).  Here, the evidence

reflects that Ms. Pendry's decision not to call any of defendant's neighbors or building security

guards was a sound tactical choice because her investigator found no witness who had even seen

---

[20]There was one security guard who was working at defendant's building on December 22, 2004, but was no longer working there at the time of the investigation (Pendry Aff. ¶ 5 n.1). The investigator tried to track this guard down through the security company, but was unable to locate him (Pendry Aff. ¶ 5 n.1).

defendant during execution of the search warrant, let alone who would testify that defendant was naked at that time (Pendry Aff. ¶ 5).

Ms. Pendry's affidavit – as well as the trial record – also dispels defendant's assertion that counsel was ineffective in failing to call Katrina Foster as a witness to rebut the government's evidence that Ms. Foster was in jail during the time period when defendant billed Medicaid for transporting her. As discussed <u>supra</u>, a computerized record from the D.C. Department of Corrections (Govt. Ex. 87), which was admitted through the testimony of a Department of Corrections records custodian (3/29/07 Tr. 57-67), showed that Ms. Foster was incarcerated from March 5, 2003, to March 10, 2004. Yet, Medicaid records reflected that defendant billed Medicaid $8,304.00 for allegedly transporting Ms. Foster numerous times during that time period (3/28/07 Tr. 141; Govt. Ex. 88). Defendant asserts that Ms. Foster's testimony "would have rebutted" the government's evidence that she was in jail during this time period and contends that because of Ms. Foster's mental disability, she would have been taken to St. Elizabeth's when arrested, not a jail (9/14/07 Motion at 18). Defendant presents no documents or affidavits to support these assertions. Moreover, Ms. Pendry states in her affidavit that, at defendant's request, she and her investigator "looked everywhere" for Ms. Foster, even in Atlanta, but were unable to locate her (Pendry Aff. ¶ 6). In light of the foregoing, it was not "outside the wide range of reasonable professional assistance" for Ms. Pendry not to call Ms. Foster as a trial witness. <u>Strickland</u>, 466 U.S. at 689.

"[A] defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from

such an investigation and whether such information, assuming its admissibility in court, would have produced a different result." United States v. Askew, 88 F.3d 1065, 1073 (D.C. Cir.) (quotation marks and citation omitted), cert. denied, 519 U.S. 986 (1996).  Here, none of the purportedly mitigating evidence or testimony would have created a reasonable probability of a different result at trial.

### 2. The Record Shows That Ms. Pendry Was Not Ineffective For Failing to Object, Move to Dismiss, or Move for a Mistrial

Defendant asserts repeatedly that counsel should have objected, moved to dismiss, or moved for a mistrial on numerous alleged grounds.  All of these claims fail, either because counsel did make such an objection or motion or because counsel made a reasonable tactical choice not to make such an objection or motion.

### a. Summary Charts

Defendant claims that Ms. Pendry was ineffective because she did not object to charts introduced by the government (9/14/07 Motion at 5).  Defendant is mistaken.  Ms. Pendry did object to the government's summary charts on the ground that the underlying records (Govt. Ex. 158) were not admissible as business records.  Once the Court ruled that the underlying documents were admissible,[21]  Ms. Pendry made no further objection (see 3/28/07 Tr. 109, 112). This was a reasonable tactical decision on counsel's part.  See United States v. Catlett, 97 F.3d

---

[21]Ms. Pendry vigorously objected to the admissibility of the underlying records, stating that the government had not laid a proper foundation for their admission as business records (3/28/07 Tr. 63-66).  Because of Ms. Pendry's persistent objections, the Court itself inquired further of the government's witness, Patricia Squires, and only admitted Govt. Ex. 158 after satisfying itself that these records were maintained in the ordinary course of business and not prepared in anticipation of litigation (3/28/07 Tr. 65-66).

565, 571 (D.C. Cir.1996) (the Court "will not second guess reasonable choices by defense counsel.").

### b.    Indictment

Defendant claims that Ms. Pendry was ineffective because she did not move to dismiss the "fatally defective indictment" after the "prosecutor dropped four elements from the indictment" (9/14/07 Motion at 6). This claim, too, lacks merit. After the government finished its case in chief, the prosecutor moved to dismiss Counts 2-5 of the indictment, the four wire fraud counts, on the ground that the government had not proven that the transaction went through interstate commerce (3/29/07 Tr. 33). The Court agreed and dismissed those four counts (id.). After the defense rested its case and the prosecutor indicated that there would be no rebuttal, the government moved to dismiss Counts 17 and 18 of the indictment on the ground that the government had presented no evidence regarding Marcellus Ashley, and the Court dismissed those counts (3/29/07 Tr. 55). The remaining twenty counts that were sent back to the jury were in no way "defective," and the jury found that the government had proved each element of every one of those twenty counts. "[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance of counsel." Bolender v. Singletary, 16 F.3d 1547, 1573 (11th Cir.), cert. denied, 513 U.S. 1022 (1994).

### c.    Opening Statement

Defendant contends that Ms. Pendry was ineffective because she failed to object to the government's opening statement or move for a mistrial thereafter (9/14/07 Motion at 5-6, 12). This claim fails for several reasons. First, defendant mischaracterizes the prosecutor's comments during opening statement. Second, Ms. Pendry did object to the government's opening

33

statement. Third, defendant never explains how any part of the government's opening statement was so prejudicial as to entitle defendant to a mistrial.

Toward the end of its opening statement, the government made one brief mention of Sudan:

> So what did [defendant] do with this money? Well, he claimed that what he was doing was he had set up a nonprofit, a charitable organization, to help his homeland of Sudan. The name of his company was Voice of Social Concern Association, Incorporated. And he claimed that that's what the money was for.

(3/26/07 Tr. 149). There was arguably nothing objectionable about this statement or about the prosecutor's statements that "defendant made $1.8 million" (3/26/07 Tr. 147), "ripped off Medicaid and is guilty of each and every one of those counts" in the indictment (3/26/07 Tr. 150).

Nevertheless, Ms. Pendry did raise the following objections at the end of the government's opening statement: 1) she had not been advised of defendant's statement that the money was intended for Sudan, 2) this constituted other crimes or bad acts evidence, yet she had received no advance notice of its use, and 3) it was irrelevant (3/26/07 Tr. 151). The government responded that the claim that the money was intended for Sudan was not an oral statement but rather was in defendant's paperwork, including his Form 990's, nonprofit tax filings for VSCA, which Ms. Pendry had received (3/26/07 Tr. 152-53). The Court overruled Ms. Pendry's objections (3/26/07 Tr. 153). Ms. Pendry then made a further objection to the government's opening statement: that by mentioning that defendant had spread out the proceeds from his illegal billing scheme over seven bank accounts, the government was getting into co-mingling of funds and other bad acts, which did not go to prove an element of the money laundering charges in the

34

indictment (3/26/07 Tr. 153).  Ms. Pendry asked the Court to instruct the jury that defendant is

not charged with co-mingling funds or failing to fund a nonprofit (3/26/07 Tr. 154).  After

argument from both parties, the Court concluded that the government had not interjected any

other crimes evidence, yet, in response to Ms. Pendry's arguments, gave the jury a brief review of

the charges in the indictment (3/26/07 Tr. 154-58).  Thus, Ms. Pendry's performance was not

ineffective with respect to the government's opening statement.

### d.    Character Evidence

Defendant alleges that Ms. Pendry was ineffective because she failed to object to negative

evidence and argument concerning defendant's character (9/14/07 Motion at 6).  Even assuming

that the questions and comments about which defendant complains qualify as character evidence,

defendant's claim fails because Ms. Pendry did make such objections and, after her objections

were overruled, elicited positive character evidence about defendant.

Specifically, defendant contends that Ms. Pendry should have objected to "questions to

[a] female witness about defendant's old sexual relationship" (9/14/07 Tr. 6).  During the direct

examination of Ms. Khangaa, the government asked a series of questions regarding how Ms.

Khangaa had met defendant and then asked, "And how close did the two of you become?"

(3/27/07 Tr. 53).  Ms. Pendry objected on relevance grounds (3/27/07 Tr. 53).  The Court

overruled the objection, but asked the government to rephrase the question (id.).  The

government then asked, "Did the nature of the relationship change?" to which Ms. Khangaa

answered "yes," and "Were the two of you then dating at some point?"and "how long" (id.).  On

cross-examination, Ms. Pendry elicited from Ms. Khangaa that defendant gave Ms. Khangaa

money while they were dating (3/27/07 Tr. 99-100) – testimony that portrayed defendant in a

35

positive light.  Thus, defendant suffered no prejudice from the admission of evidence, over Ms.

Pendry's objection, concerning his romantic relationship with Ms. Khangaa.

In addition, defendant claims that Ms. Pendry failed to object to the prosecutor's alleged

comments that "defendant does not help his employees" and "is not good for the local

community" (9/14/07 Motion at 6).  Defendant is mistaken in several respects.  First, the

prosecutor did not make the alleged comments.  For example, in his opening statement, the only

comment by the prosecutor that was related to defendant's relationship with his employees was

the following:

> What happened with that $1.8 million? . . . . Did he share that money with [his
> employees]?  Absolutely not.  He paid the drivers per trip that they actually made
> (3/26/07 Tr. 148-49).

Second, the record reflects that during the trial testimony, Ms. Pendry tried to keep out evidence

that might tend to show that defendant exploited his employees.   For example, when the

prosecutor asked one of defendant's former drivers, Michael Rajj, "Did you ever loan the

defendant any money?" Ms. Pendry objected on relevance grounds, and her objection was

sustained (3/27/07 Tr. 26-27).  Furthermore, on cross-examination, Ms. Pendry elicited from Mr.

Rajj that defendant paid Mr. Rajj on a regular basis and that the more Mr. Rajj worked, the more

he got paid (3/27/07 Tr. 37).  Third, during closing argument, Ms. Pendry objected, but was

overruled, after the prosecutor stated the following:

> And let's talk about why the drivers made a mistake working for this man.  Well, they
> made a mistake working for this man because who just gives up 15 percent of your
> income to somebody for what?  Did they choose to work for him?  Yes, they did.  Were

36

they forced to?  No, they weren't.  But you would expect an employer to treat an employee with some respect (3/29/07 Tr. 75).[22]

Thus, it is clear from the record that Ms. Pendry made objections to negative evidence and argument relating to defendant's character, just as defendant alleges she should have done. Moreover, Ms. Pendry elicited evidence that reflected well on defendant – that he gave his girlfriend money and that he paid his drivers based on the amount of work they did – thereby negating any claim of ineffectiveness.

### e.    Alleged Constitutional Violations

Defendant contends that Ms. Pendry was ineffective for failing to move to dismiss the case based on unspecified Fifth Amendment violations (9/14/07 Motion at 7).  Defendant also alleges that the government's failure to turn over a videotape purportedly taken at Ms. Khangaa's apartment on the day on which the search warrant was executed and the government's failure to produce all of the trip logs and "VSCA clients received forms" were Brady violations, to which Ms. Pendry should have objected (9/14/07 Motion at 7-8).  Defendant's claims are devoid of any merit.

---

[22]Despite having her objection overruled by the Court, Ms. Pendry objected again a few lines later after the prosecutor stated:

> And what 15 percent did it require to run this company?  He's running this company out of his house, ladies and gentlemen.  He has no overhead beyond his own rent.  What does he have to do?  He has to make a couple copies of these preprinted driver logs and a preprinted master list.  Is that 15 percent?  It didn't go to taxes (3/29/07 Tr. 75-76).

Ms. Pendry objected on the basis that this case did not involve any allegation of failure to pay taxes, and the Court reminded the jurors that were no tax allegations in this case and that tax-related issues were irrelevant (3/29/07 Tr. 76).

Brady requires the government to disclose information that is both "favorable to an accused" and "material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87 (1963). Evidence "favorable to an accused" includes evidence that can be used to impeach a government witness. United States v. Bagley, 473 U.S. 667, 676 (1985). Evidence is "material" only if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. "[S]trictly speaking, there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler v. Greene, 527 U.S. 263, 281 (1999).

Defendant faults the government for not disclosing a videotape allegedly taken on the day of the search warrant at Ms. Khangaa's apartment (9/14/07 Motion at 7). There are a couple of problems with this claim. First, defendant fails to show that such a videotape actually existed, and the record is inconclusive on this point. Ms. Khangaa testified on cross-examination as follows:

> Q:    And, in fact, your conversation with [Agent Burris] on [December 22, 2004] was videotaped, wasn't it?
>
> A:    Correct. (3/27/07 Tr. 86.)

In contrast, Special Agent Burris testified as follows on direct examination:

> Q:    Did you videotape your interview of [Ms. Khangaa]?
>
> A:    No, I did not.
>
> Q:    Did you see a video camera being used by any of the agents in her apartment on that date, December 22, 2004?

> A:    The search warrant was either videotaped or photographed. I do not
>        remember which one was done. But the interview itself was not videotaped
>        or photographed in any way. (3/29/07 Tr. 40-41).

Second, defendant makes no claim as to how this videotape, either of the interview with Ms.

Khangaa or of the execution of the search warrant, if such a videotape existed, would have aided

the defense (9/14/07 Motion at 7). Given the overwhelming evidence against defendant, there is

no reasonable probability that such a videotape, even assuming that it existed, would have

changed the outcome of the trial if obtained by the defense. Thus, Ms. Pendry was not

ineffective for failing to obtain it, to object to its non-production, or to move for dismissal.

Defendant also faults the government for allegedly "refus[ing] to disclose all the trip logs

in [the] name of Akiuber James" (9/14/07 Motion at 8). This claim is baseless. First, it is clear

from the record that all of the trip logs (also referred to as driver's logs) that were found in

defendant's apartment were disclosed to the defense. Inspector Evans testified at the motions

hearing that "[a]ll the driver's logs collected" during execution of the search warrant at

defendant's residence "are now at the U.S. Attorney's Office" (3/21/07 Tr. 25). And Ms. Pendry

acknowledged during the hearing that the government had provided "the bulk of the trip logs,"

some in paper form and "thousands of these trip logs" on disk (3/21/07 Tr. 139). Second,

defendant fails to explain how "those trip logs would have impeached the government['s] key

witnesses and rebut[ted] [the] government['s] 21 counts of health pretenses [sic]" (9/14/07

Motion at 8). If anything, the trip logs corroborated other evidence that defendant billed

Medicaid for trips for which defendant did not receive prior authorization (see, e.g., Govt. Ex.

49, a driver's log on which the column for "Medicaid Number and Authorization number" is

blank for each customer listed). And, as the government explained in its closing argument,

regardless of the number of driver's logs that were found or produced, the government proved

through bank records and other evidence the amount of money the drivers were paid (see Govt.

Exs. 34-38) , based on actual trips made, and if defendant had billed Medicaid for those trips

only (including the trips for which he did not receive prior authorization), he would have billed

for $600,000, not $1.8 million (3/29/07 Tr. 84-85,102).  Thus, Ms. Pendry was not ineffective for

failing to object or move for dismissal based on the trip logs.

    The same is true regarding the "VSCA clients received forms."  Defendant claims that the

government "fail[ed] to disclose 90% of the VSCA clients received forms" (9/14/07 Motion at

8).  Defendant is mistaken.  First, Inspector Evans testified at the motions hearing that he was not

aware of any documents collected during the execution of the search warrant at defendant's

residence that were not at the U.S. Attorney's Office, and Ms. Pendry acknowledged during the

hearing that the government had provided "a fair amount of discovery" (3/21/07 Tr. 25, 138).

Second, even assuming arguendo that the government did not disclose all of the VSCA

Receiving Calls forms, defendant fails to explain how "those forms would have impeached [the]

government's key witnesses and rebutted [the] 21 health pretenses counts [sic]" (9/14/07 Motion

at 8).  If anything, like the trip logs, the VSCA Receiving Calls forms corroborated other

evidence that defendant billed Medicaid for trips for which defendant did not receive prior

authorization (see, e.g., Govt. Ex. 48, two Receiving Calls forms on which the space for

"Authorization" is blank for each customer listed).  Thus, Ms. Pendry was not ineffective for

failing to object or move for dismissal based on the VSCA Receiving Calls forms.

f.     **Closing Argument**

Defendant contends that Ms. Pendry was ineffective because she failed to object to the government's closing argument or move for a mistrial thereafter (9/14/07 Motion at 7, 12, 14). This claim fails for several reasons. First, defendant mischaracterizes the prosecutor's comments during closing argument. Second, Ms. Pendry did object to the government's closing argument. Third, defendant never explains how any part of the government's closing argument was so prejudicial as to entitle defendant to a mistrial.

During its initial closing argument, the government made the following statements:

> He went so far as to use his own employees. . . . He ripped Medicaid off to somewhere in the neighborhood of $1.8 million.

(3/29/07 Tr. 70). There was arguably nothing objectionable about these statements or about the prosecutor's statements, discussed <u>supra</u> in Part II.D.2.d., regarding "why the drivers made a mistake working for" defendant (3/29/07 Tr. 75). From a review of the transcript, it does not appear that the government mentioned anything during closing arguments about Sudan, defendant's sending money to Sudan, or defendant's failure to help his girlfriend (see generally 3/29/07 Tr. 70-85, 98-103). Even if the government had made such comments, there would have been nothing objectionable about them. Defendant never explains how any of these alleged comments in the government's closing argument were so prejudicial as to entitle defendant to a mistrial.[23] As already discussed in Part II.D.2.d., Ms. Pendry nevertheless did make objections

---

[23]Certainly a prosecutor may not make statements calculated to arouse the passions or prejudices of the jury. <u>United States v. Monaghan</u>, 741 F.2d 1434, 1440 (D.C. Cir. 1984), <u>cert. denied</u>, 470 U.S. 1085 (1985). At the same time, in assessing a prosecutor's statements to the jury, a court "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that

(continued...)

during the government's closing argument, and those objections were overruled (3/29/07 Tr. 75-76).  Even if she had not made these objections, any alleged error was not "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687.

### g.    Sufficiency of the Evidence

Defendant contends that Ms. Pendry was ineffective in that she failed to object to the allegedly insufficient evidence (i) of health care fraud, specifically the government's alleged failure to prove injury, loss, or damages, (ii) that defendant's conduct was knowing and intentional, and (iii) of "four elements" (9/14/07 Motion at 8-9, 14-15).  Defendant's claims are without merit.

"The standard for overturning a guilty verdict on the grounds of insufficiency of evidence is a demanding one." United States v. Maxwell, 920 F.2d 1028, 1035 (D.C. Cir. 1990).  In considering a preserved challenge to the sufficiency of the evidence, the Court of Appeals will review the evidence of record de novo, considering the evidence in the light most favorable to the government, and affirm a guilty verdict where "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Wahl, 290 F.3d 370, 375 (D.C. Cir.) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)), cert. denied, 537 U.S. 862 (2002). "The evidence need not exclude every reasonable hypothesis of innocence or be

---

[23](...continued)
meaning from the plethora of less damaging interpretations." Donnelly v. DeChristoforo, 416 U.S. 637, 646-647 (1974); see also Monaghan, 741 F.2d at 1437 ("When assessing the constitutionality of ambiguous prosecutorial remarks, an appellate court should not strain the reach the one interpretation which ascribes improper motives to the prosecutor.").  None of the remarks that defendant challenges and that were actually made were impermissible.

wholly inconsistent with every conclusion except that of guilt." Maxwell, 920 F.2d at 1035

(quotation omitted).  "No distinction is made between direct and circumstantial evidence in

evaluating the sufficiency of evidence supporting a guilty verdict."  Id.  This standard is "highly

deferential."  United States v. Lucas, 67 F.3d 956, 959 (D.C. Cir. 1995).

First, the health care fraud statute, 18 U.S.C. § 1347, requires that the government prove

that defendant:

> knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or
> artifice–
>
> > (1) to defraud any health care benefit program; or
> >
> > (2) to obtain, by means of false or fraudulent pretenses, representations, or
> > promises, any of the money or property owned by, or under the custody or
> > control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or
> services . . . .

As the Court correctly instructed the jury in this case, there is no requirement that defendant

succeed in causing Medicaid to suffer a loss:

> Although it is not necessary for the government to prove an actual loss of funds by
> the healthcare benefit program, the government must prove beyond a reasonable
> doubt that by executing or attempting to execute the scheme alleged in the
> indictment the defendant placed the healthcare benefit program at a risk of loss and
> that the healthcare benefit program did not knowingly accept such a risk. (3/29/07
> Tr. 120.)

Even though the government was not required to prove a loss, the government did, in fact, prove

that defendant, by filing fraudulent claims, caused Medicaid to suffer a loss of approximately

$1.8 million (minus approximately $6,000, which represents payments for the trips for which

defendant received prior authorizations).  Thus, Ms. Pendry was not ineffective for failing to

43

object that the government's evidence was insufficient to prove health care fraud.  See Bolender,
16 F.3d at 1573 ("the failure to raise nonmeritorious issues does not constitute ineffective
assistance of counsel").

Second, defendant claims that the government presented insufficient evidence that
defendant's conduct was knowing and intentional (9/14/07 Motion at 15).  Defendant is
mistaken.

In this case, the evidence was sufficient to permit a rational fact finder to find that
defendant's conduct was knowing and intentional.  Defendant had received numerous documents
and manuals explaining the requirements for reimbursement by D.C. Medicaid for transportation
services, and these documents, some of which he had signed, were recovered from his residence
during execution of the search warrant (see, e.g., Govt. Exs. 2, 6, 8).  In addition, defendant
created documents for VSCA that reflected his proper understanding of these rules (see, e.g.,
Govt. Exs. 27-28).  Yet, he flagrantly violated those rules by, inter alia, billing Medicaid for
allegedly transporting people who were dead (e.g., Janet Burness (Govt. Ex. 96)), who were in
jail (e.g., Katrina Foster (Govt. Ex. 87)), and who were physically able to take public
transportation to their medical appointments (e.g., Gwendolyn Moore (3/27/07 Tr. 126)).  Thus,
Ms. Pendry was not ineffective for failing to object that the government had presented
insufficient evidence that defendant acted knowingly and intentionally.

Third, defendant claims that the government "fail[ed] to sustain its burden of pro[of] on
four elements" (9/14/07 Motion at 14).  Defendant does not specify what these "four elements"

were.[24]  However, it appears that defendant may be referring to four charges that the Court

dismissed at the government's request  – Counts 2-5, the wire fraud counts (3/29/07 Tr. 33).

Assuming that this is what defendant means, the government's failure to prove – and resulting

request to dismiss – Counts 2-5 in no way undercut the government's proof of the twenty counts

of conviction.  As the government explained when seeking dismissal of the four wire fraud

counts after resting its case, the government had failed to prove that the wire transactions went

through interstate commerce (3/29/07 Tr. 33).  Sharon Myles of Bank of America testified that

she could not determine, based solely on her review of the bank statements, whether the funds

that were transferred via direct deposit from the D.C. Government to defendant's bank account

for VSCA at Bank of America had passed through interstate commerce (3/28/07 Tr. 119-22).  In

order to determine this, she had to speak to someone in the "ACH department" (3/28/07 Tr. 121-

22).  Ms. Pendry properly objected to the admission of the contents of that conversation on the

basis of hearsay, and the Court sustained the objection (3/28/07 Tr. 121).  Thus, the government

was unable to prove that the wire transactions had passed through interstate commerce, but this

in no way affected the other charges in the indictment.  As the government explained to the Court

(3/29/07 Tr. 33), the interstate element of health care fraud was met by, inter alia, the testimony

of Patricia Squires that D.C. Medicaid worked with medical providers in D.C., Maryland, and

---

[24]Interestingly, defendant later claims that he should have been acquitted because the government failed to sustain its burden on "three elements," and he similarly fails to identify those "elements" (see 2/19/08 Motion at 16-17).

Virginia (3/28/07 Tr. 58).  Accordingly, Ms. Pendry was not ineffective for failing to object that

the government had presented insufficient evidence of four charges which the Court dismissed.[25]

### h.    Tax Returns

Defendant contends that Ms. Pendry was ineffective for failing to object to the

government's alleged "prosecutorial misconduct" by "bringing Tax report of VSCA 2002 for

trial" (9/14/07 Motion at 14; 2/19/08 Motion at 12).  Defendant also alleges that the government

"seized Tax return of VSCA (year 2000 $150,000.00) Non-profit Branch" even though it was

outside the scope of the search warrant and used it at trial in violation of the Fourth Amendment

(9/14/07 Motion at 17).  Each of these allegations is devoid of any merit.

First, the government finds no evidence in the record that a VSCA tax return for tax year

2000 or 2002 was ever admitted into evidence.  Second, as to the 2001 Return of Organization

Exempt from Income Tax (Form 990) for VSCA that was admitted (Govt. Ex. 160), the record

contradicts defendant's claims.  First, the government acted properly in seeking admission of the

return, because defendant's representations thereon were consistent with his scheme to defraud

Medicaid and were, thus, relevant.  Defendant has failed to show otherwise.  Second, contrary to

defendant's allegation, Ms. Pendry vigorously objected on relevance grounds to the admission of

the return (see 3/28/07 Tr. 43-44).  Third, the return was properly admitted into evidence over

Ms. Pendry's objections with an instruction to the jury that defendant is not charged with any

violations of the Internal Revenue Code and that there are no allegations of tax fraud (see 3/28/07

Tr. 42-44).  Defendant states no basis for his allegation of unfair prejudice from the admission of

---

[25]Following the dismissal of those four charges, Ms. Pendry moved "that all the counts in
the indictment be dismissed under Rule 29" (3/29/07 Tr. 34).  The Court denied her motion
without prejudice (id.).

this document.  To the extent that defendant is arguing that VSCA's 2001 Form 990 was outside

the scope of the search warrant that was executed at defendant's residence because this return

concerned only the non-profit side of VSCA, such an argument must fail because defendant

knowingly commingled all of VSCA's funds.  Furthermore, Robert Jodoin of the U.S. Attorney's

Office testified that VSCA's 2001 Form 990 is publicly available on the Internet (3/28/07 Tr. 48-

49).  Thus, there was no prosecutorial misconduct, no ineffective assistance by Ms. Pendry, and

no error by the Court related to the admission of VSCA's 2001 Form 990.

### i.    **Medicaid Provider Numbers**

Defendant faults Ms. Pendry for taking no further action after eliciting during cross-

examination that two Medicaid health-care providers had used defendant's Medicaid provider

number (9/14/07 Motion at 17-18).  Defendant's claim is squarely contradicted by the record.

Ms. Pendry's defense theory was that not all of the claims filed by defendant were

fraudulent and that the Medicaid evidence on which the government relied was flawed (see

3/29/07 Tr. 86; Pendry Aff. ¶¶ 7-8).  As support for this theory, Ms. Pendry cited in her closing

argument, inter alia, the fact that two Medicaid health-care providers had used defendant's

supposedly unique Medicaid provider number (3/29/07 Tr. 87; Pendry Aff. ¶ 7).[26]  As defendant

acknowledges, Ms. Pendry had elicited this information during cross-examination of one of the

government's witnesses (3/28/07 Tr. 17-20).  Accordingly, Ms. Pendry did take further action

after eliciting this information, contrary to defendant's allegation.  Even if she had taken no

---

[26]In her closing argument, in order to show that the Medicaid data and system were
flawed, Ms. Pendry also cited the fact that the same, supposedly unique, Medicaid numbers were
used by different recipients (Pendry Aff. ¶ 7).

further action, she was still "functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." Strickland, 466 U.S. at 687.

### 3.    Ms. Pendry Had No Conflict of Interest and Did Not Collude With the Government or Undermine Defendant's Interests in Any Way

Defendant alleges without any foundation that Ms. Pendry had a "relationship" with the

government and an unspecified conflict of interest,[27] that she secretly revealed the defense's trial

strategy to the prosecutor pretrial, and that she "leaked" an alleged list of eight defense witnesses

to the government (9/14/07 Motion at 4, 5, 7, 9, 12). Defendant also either falsely or mistakenly

contends that Ms. Pendry denied him access to his seized files, failed to cross-examine Brian

Evans (a government witness), made unspecified false representations to the Court, and

persuaded defendant's subsequent attorney, Pleasant Broadnax, to be ineffective (9/14/07 Motion

at 4, 7, 9, 16). As demonstrated by the record and Ms. Pendry's affidavit, each of these

assertions is absolutely false and completely baseless.

Where a defendant's claim of ineffective assistance of counsel is predicated upon an

alleged conflict of interest, "a defendant must establish that an actual conflict of interest

adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).

"Under such circumstances, . . . prejudice would then be presumed." Id. "But if the attorney's

alleged shortcoming is utterly unrelated to the conflict, the defendant cannot make use of the

Cuyler presumption of prejudice and must instead proceed under Strickland." United States v.

Bruce, 89 F.3d 886, 896 (D.C. Cir. 1996). The Court of Appeals for the D.C. Circuit has

---

[27]Defendant also asserts repeatedly, without any foundation, that the government "intru[ded] into [the] attorney-client relationship" in unspecified ways (9/14/07 Motion at 8, 10, 16).

generally been reluctant to allow defendants to "force their ineffective assistance claims into the 'actual conflict of interest' framework . . . and thereby supplant the strict Strickland standard with the far more lenient Cuyler test." Id. at 893.

First, defendant has failed to establish an actual conflict of interest. Defendant has presented no evidentiary support for the naked assertions contained in his motions. As Ms. Pendry states in her affidavit, she had no personal interest in the outcome of this case and complied with all ethical rules both during and after her representation of defendant (Pendry Aff. ¶ 9). Thus, defendant's claim that there existed a conflict of interest is entirely deficient.

Second, even assuming arguendo that there existed a conflict of interest, defendant has failed to establish that the conflict adversely affected Ms. Pendry's performance at trial. Nothing in the record suggests that a conflict of interest motivated counsel's conduct during the trial. Moreover, there is no evidence in the record of the specific adverse actions that defendant alleges Ms. Pendry committed. For example, defendant alleges that Ms. Pendry "leaked" a list of eight defense witnesses to the government and that the government then harassed these witnesses and caused them not to testify (9/14/07 Motion at 9). Yet, defendant fails to identify or provide affidavits from any of these witnesses. And Ms. Pendry recalls that she turned over the defense witness list to the government when ordered to do so by the Court (Pendry Aff. ¶ 9).

Furthermore, defendant's assertion that Ms. Pendry failed to cross-examine Brian Evans is belied by the record (9/14/07 Motion at 7). The record reflects that Ms. Pendry vigorously cross-examined this government witness (see 3/29/07 Tr. 10-22).

In addition, defendant's allegation that Ms. Pendry denied him access to his seized files is entirely baseless (9/14/07 Motion at 4, 16). As Ms. Pendry states in her affidavit, the documents

that were seized from defendant's residence were made available for her review at the U.S.

Attorney's Office (Pendry Aff. ¶ 10). Ms. Pendry spent several hours at the U.S. Attorney's

Office reviewing those documents and preparing her own summaries (Pendry Aff. ¶ 10). She

later met with defendant at the Federal Public Defender's office in Baltimore and discussed her

summaries of the documents with him (Pendry Aff. ¶ 10). According to Ms. Pendry, defendant

never asked to see any of the seized documents, and, if he had asked, she would have arranged

for him to see them (Pendry Aff. ¶ 10).

All of defendant's other allegations of misconduct by Ms. Pendry, purportedly stemming

from a conflict of interest, are similarly baseless.[28] Therefore, defendant's contention that a

conflict of interest adversely affected Ms. Pendry's representation of defendant should be

rejected as lacking any foundation whatsoever.

### 4.    The Record Shows that Ms. Pendry Was Not Ineffective for Failing to Argue that the Prosecution of Defendant Was in Bad Faith.

Defendant faults Ms. Pendry for failing to halt the "vindictive prosecution" of defendant

(9/14/07 Motion at 12). This claim fails because any argument that the government was

prosecuting defendant in bad faith would have been meritless. Defendant's outrageous

allegations concerning the history of this case are completely unsupported by the record.

As the record reflects, defendant received a letter from D.C. Medicaid dated April 8,

2004, notifying him of an upcoming audit, which took place as scheduled on April 22, 2004

---

[28]For example, as further evidence of Ms. Pendry's purported conflict of interest, defendant alleges that Ms. Pendry persuaded defendant's subsequent attorney, Pleasant Broadnax, to be ineffective and never gave him her files (9/14/07 Motion at 16). These allegations are squarely contradicted by Ms. Pendry's affidavit, in which she states that she never encouraged Mr. Broadnax to take any action adverse to defendant's interests and that she turned over several boxes of files to Mr. Broadnax (Pendry Aff. ¶ 9).

(3/27/07 Tr. 187, 194).  The audit was based on evidence (including a provider claims history

profile) reflecting that VSCA was one of the highest paid, D.C. Medicaid providers from October

1, 2002, to September 30, 2003 (3/27/07 Tr. 185, 188, 192-93; Govt. Ex. 52-B).  The primary

purpose of an audit is to review log sheets (also referred to as driver's logs or trip logs) that

document that services were rendered during a specified time period (3/27/07 Tr. 185).  During

the audit on April 22, 2004, defendant was asked for his log sheets for particular recipients of

transportation services, but he failed to provide any documentation to support his billing for

those particular recipients (3/27/07 Tr. 196-97).  Defendant was told that he could submit

documentation after the audit – and he did – but he enclosed no log sheets or other

documentation to support his billing for those recipients (3/27/07 Tr. 198-99; Govt. Ex. 54).

On December 21, 2004, seizure warrants were executed for the money in defendant's

bank accounts, and on December 22, 2004, seizure warrants were executed –  simultaneous with

the search warrant for defendant's residence – for two of his vehicles (3/28/07 Tr. 151; 3/29/07

Tr. 12-14).[29]  The warrants were based on evidence that defendant had engaged in a scheme to

_____

[29]On February 18, 2005, the government filed an in rem civil action for forfeiture of these
funds and vehicles.  Dist. Ct. PACER Docket Entry (05-CV-356 (EGS))  #1.  The complaint
alleged that these funds and vehicles constituted or were derived from proceeds traceable to
violations of the health care fraud, mail fraud, wire fraud, and anti-money laundering statutes.  Id.
Contrary to defendant's claim, there was no allegation in the complaint that defendant's funds
should be forfeited "because he is helping his children in Africa" and "does not deserve to have
money that much" (9/14/07 Motion at 10).  Defendant filed numerous pleadings and motions
seeking return of these funds and vehicles.  See, e.g., Dist. Ct. PACER Docket Entries (05-CV-
356 (EGS)) ##2-6, 18-20, 23-24, 30, 35-37.

On December 27, 2005, the Court clerk received, and on January 30, 2006, filed on
defendant's behalf, defendant's civil complaint against the government alleging that he had been
"robbed" of his funds and vehicles.  Dist. Ct. PACER Docket Entry (06-CV-150 (EGS)) #1 (Jan.
30, 2006).  On January 31, 2006, defendant's motion for leave to proceed in forma pauperis was

(continued...)

defraud D.C. Medicaid by submitting false billing for transportation services that defendant falsely claimed to have provided.

On January 25, 2006, defendant was indicted for health care fraud and related offenses. Dist. Ct. PACER Docket Entry #1. On February 1, 2006, a superseding indictment was filed. Dist. Ct. PACER Docket Entry #3.

Ms. Pendry was appointed by the Court to represent defendant on September 21, 2006. Dist. Ct. PACER Docket Entry. Most of the alleged events that defendant claims constitute evidence of a "vindictive" prosecution occurred before Ms. Pendry's appearance in this case and were already on hold by the time she began her representation of defendant. Moreover, not a shred of evidence has been presented by defendant to support any of his outrageous allegations of retaliation. Each step taken by the government was based upon evidence of fraudulent billing of D.C. Medicaid by defendant, and the evidence against defendant was overwhelming. Thus, Ms. Pendry was not ineffective for failing to argue that the prosecution of defendant was "vindictive" or "in bad faith."

### 5.  Conclusion

Defendant has raised a number of claims in support of his contention that Ms. Pendry's performance was constitutionally ineffective. All of his claims are based solely on cursory assertions in his motions. And all of his claims ignore that, at trial, "overwhelming" evidence was produced of his guilt. "The essence of an ineffective-assistance of counsel claim is that

---

[29](...continued)
granted. Dist. Ct. PACER Docket Entry (06-CV-150 (EGS)). On August 31, 2006, the government's motion to consolidate defendant's civil action (06-CV-150) with the government's forfeiture case (05-CV-356) was granted, and all proceedings were stayed pending resolution of the instant criminal case. Dist. Ct. PACER Docket Entry (06-CV-150 (EGS)).

counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986). Here, the record shows that "the adversarial balance" was not upset, that defendant received a fair trial with a reliable verdict based on overwhelming evidence, and that counsel's performance was not deficient. Therefore, the Court should summarily deny defendant's ineffective assistance of counsel claim.

### III.    Defendant's Remaining Claims Fail

Defendant raises a host of other claims (described in Part I, <u>supra</u>). These claims should be summarily denied because they are without merit.

#### A.    Defendant's Claims of Government Misconduct (Claims B, D, F, 2, 3, 4) Fail

Defendant asserts in Claims B, D, F, 2, 3, and 4 that he was denied a fair trial and, in some instances, his Constitutional rights were violated because of the government's alleged misconduct. Most of these allegations were addressed in Part II, <u>supra</u>, and, to the extent that they were not previously addressed, they are addressed below. All of these claims ignore that the evidence at trial overwhelmingly established defendant's guilt for engaging in a scheme to defraud Medicaid.

Defendant contends that the government violated his Sixth Amendment rights by seizing all of the funds in his bank accounts, thereby preventing him from obtaining effective representation (9/14/07 Motion at 13). This argument is frivolous. First, defendant suffered no prejudice, because, as shown in Part II, <u>supra</u>, Ms. Pendry functioned "as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687. Second, there is no constitutional right to retain counsel using stolen funds. <u>See</u>, <u>e.g.</u>, <u>Caplin & Drysdale</u>,

Chartered v. United States, 491 U.S. 617 (1989) (forfeiture statute for illegal drug-related

proceeds, which provided no exception for property used to pay attorney's fees, did not

impermissibly burden defendant's Sixth Amendment right to retain counsel of his choice).

Defendant contends that the government violated his due process rights by seizing his

property, then waiting fourteen months to indict him (9/14/07 Motion at 15).  There was no

unreasonable delay between the seizure of defendant's assets and the indictment of defendant,

and, thus, there was no due process violation stemming from the delay.  See United States v.

Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in United States Currency, 461 U.S.

555 (1983) (finding the 18-month delay between seizure and commencement of the forfeiture

action did not violate the claimant's due process rights); United States v. Turner, 933 F.2d 240,

246 (4th Cir. 1991) (16-month delay not unreasonable); United States v. Funds in the Amount of

$37,760.00, 1998 WL 42465 (N.D. Ill. 1998) (38-month delay justified).

Defendant contends that his Fifth and Sixth Amendment rights were violated by the

trial's ending without defendant presenting the "second phase of the trial" (2/19/08 Motion at 1,

8).  It is unclear what defendant means by this.  To the extent that he is referring to an

opportunity to present a defense case, his claim is contradicted by the record.  Ms. Pendry did

call one witness, Special Agent Regina Burris, on defendant's behalf and moved several

documents into evidence (see 3/29/07 Tr. 39-52).

Defendant asserts that the government violated his Fourth Amendment rights on

December 22, 2004, by seizing him without an arrest warrant and by seizing documents that were

beyond the scope of the search and seizure warrants (2/19/08 Motion at 14-16).  These claims are

without merit.  First, defendant was never under arrest and was free to leave his apartment during

execution of the search warrant (3/21/07 Tr. 21, 38, 49). Defendant's testimony that he was forced to stand naked in the hallway in handcuffs for two hours was properly rejected by this Court as less persuasive than Inspector Evans' testimony to the contrary (3/21/07 Tr. 134, 136-38). Second, the government stayed within the parameters of the search warrant when it seized documents from defendant's residence. The Court implicitly rejected defendant's arguments to the contrary when it correctly denied defendant's motion to suppress physical evidence (3/21/07 Tr. 132-38).[30]

Accordingly, all of defendant's claims of government misconduct should be summarily rejected.

### B.      Defendant's Claims of Insufficiency of the Evidence (Claims C and 8) Fail

In these claims, defendant argues that the evidence was insufficient to convict him. These claims fail because they ignore the "overwhelming" evidence of his guilt.

### C.      Defendant's Equal Protection Claims (G and 9) Fail

In these claims, defendant asserts that the Equal Protection Clause was violated by 1) "community discrimination" in the selection of the jury (9/14/07 Motion at 19), and 2) the government's "discriminatory administration of valid statutes" in this case (2/19/08 Motion at 17). These claims are baseless. First, although it is correct that "the Constitution prohibits all forms of purposeful racial discrimination" in jury selection, Batson v. Kentucky, 476 U.S. 79, 88

---

[30]As the government previously argued in its opposition to defendant's pretrial motions (Dist. Ct. PACER Docket Entry #27 (Jan. 16, 2007)), defendant's reliance on United States v. Srivastava, 444 F. Supp.2d 385 (D. Md. 2006), is misplaced. In Srivastava, an agent testified that he intentionally ignored the limited language of the search warrant when deciding to seize thousands of documents beyond the scope of the warrant. Id. at 397-98. Here, there is no evidence of such conduct.

(1986), defendant has adduced no evidence of any such discrimination during jury selection in this case. Thus, insofar as we understand defendant's claim, it is without merit.

Second, a party claiming the defense of discriminatory enforcement of prosecutorial discretion carries a heavy burden of proving the actual existence of intentional and purposeful discrimination against him as an individual or the class of which he is a member.[31] Washington v. United States, 401 F.2d 915, 925, 130 U.S. App. D.C. 374, 384 (1968). Defendant alleges that the government prosecuted him because he filed a civil lawsuit to recover his money and vehicles (2/19/08 Motion at 17). Defendant cites no evidentiary support for this assertion. As discussed in Part II.D.4., supra, each step taken by the government in this case was based upon evidence of fraudulent billing of D.C. Medicaid by defendant, and the evidence against defendant was overwhelming. Defendant has failed to make a valid showing of intentional and purposeful discrimination, and his equal protection claim is therefore without merit.

### D.    Defendant's Discrimination Claims (E and 7) Fail

Defendant asserts in Claims E and 7 that the Court demonstrated prejudice against defendant because defendant is from Sudan (9/14/07 Motion at 9, 17-18), specifically when the Court suggested that it should ask a voir dire question regarding national origin (2/19/08 Motion at 5). The record is devoid of any evidence of discrimination against defendant by the Court based on race, national origin, or any other impermissible basis. With respect to voir dire, the Court simply inquired, outside the presence of the jury panel, whether the defense wished to have

---

[31]Selectivity in law enforcement does not violate the Constitution if it rests upon a valid ground. United States v. Steele, 461 F.2d 1148, 1152 (9th Cir. 1972). Selectivity in law enforcement is impermissible only if designed to discriminate against those prosecuted. People v. Utica Daw's Drug Co., 16 A.D.2d 12, 21, 225 N.Y.S.2d 128, 136, 4 A.L.R.3d 393, 402 (1962).

the Court ask a question regarding national origin (3/21/07 Tr. 140). Typically, the purpose of such a question is to ferret out those jurors who harbor prejudices based on national origin and to eliminate them from the jury. This would presumably inure to defendant's benefit. Nothing about the Court's suggestion indicates racial or national animus on the Court's part, and defendant has failed to show otherwise. Thus, defendant's claims of discrimination by the Court against him based on his national origin are without merit.

### E.    Defendant's Claim of Error in Denying Pretrial Motions (Claim 5) Fails

Defendant asserts in Claim 5 that the Court erred in denying defendant's motions to suppress evidence and to dismiss the indictment (2/19/08 Motion at 3-5, 8-10). As discussed in Parts II.D.2.c. (indictment), II.D.2.h. (physical evidence), and III.A. (physical evidence), the Court properly denied defendant's motions.

### F.    Defendant's Conspiracy Claim (Claim 6) Fails

Defendant asserts that the Court, government, and defense counsel conspired against him in various ways, including by preventing the jury from seeing the indictment and by revising the jury instructions (2/19/08 Motion at 4, 6-7). Defendant's allegation of a conspiracy against him is utter fantasy, and his claims reflect either a misunderstanding or intentional distortion of the trial transcripts.

With respect to whether the jury should see the indictment, the Court and counsel had the following discussion on the first day of trial:

> COURT: . . . . I guess another question I have is this. It's a complicated case. Normally in complicated cases I will send the indictment back to the jury room with the instructions, obviously, that the indictment is not evidence. Any problems with that?

MS. PENDRY: Your Honor, I think I do have a problem with that, given the fact that the government has a very lengthy recitation of facts it intends to prove at trial.

THE COURT: All right. I would redact that and just send back the appropriate portion. I can go over the indictment at the appropriate time. We have some time, obviously, between now and then. But if we can provide the jurors with some guidance.

MS. PENDRY: I don't oppose the elements.

THE COURT: Maybe I'll just do that. We can talk about that at the appropriate time. (3/26/07 Tr. 10-11.)

On the last day of trial, after closing arguments and before the Court instructed the jury,

the Court again raised this issue with counsel:

THE COURT: All right, counsel. You have a copy of the verdict form. It separates out the counts. In view of that, is there really a need to send the indictment back? I don't have any strong feelings. If you send it back, there's going to have to be redactions. We can talk about it after instructions. (3/29/07 Tr. 104.)

The Court continued a couple minutes later:

THE COURT: All right. What's your pleasure now about the indictment? I need to change the instructions. Do you want the indictment to go back as redacted?

MR. AUSTIN: Yes, Your Honor.

MS. PENDRY: I'm sorry, Your Honor, I missed that?

THE COURT: Do you want the indictment to go back as redacted; and, if so, you two need to make your redactions?

MS. PENDRY: I'll work with Mr. Austin on it. (3/29/07 Tr. 106.)

Contrary to defendant's allegation, the record makes clear that the jury did receive a copy

of the indictment, as redacted by the parties. Furthermore, the record reflects that the redactions

were for the benefit of defendant. Ms. Pendry requested that the government's factual allegations

in the indictment be redacted, believing that it would be in defendant's best interest to compel the government to rely on testimony, documents, and argument to get its factual allegations before the jury (Pendry Aff. ¶ 11). This was a wise tactical move on Ms. Pendry's part and yet another example of her effective representation of defendant. Defendant has shown no prejudice from this request by his counsel or from the government's and the Court's acquiescence to it.

Similarly, at least one of the small wording changes in the jury instructions about which defendant complains (2/19/08 Motion at 6-7) clearly inured to defendant's benefit (see 3/29/07 Tr. 141-43). Before the change, the instruction stated in relevant part: "If you find beyond a reasonable doubt that Medicaid was a healthcare benefit program affecting interstate or foreign commerce, then the first element of the crime is satisfied" (3/29/07 Tr. 141). The Court changed the latter phrase to state, "[t]hat portion of the first element of the crime is satisfied" (3/29/07 Tr. 143). This was to defendant's benefit because it was more accurate and made clear that additional proof was necessary to satisfy the entire first element of the crime. Defendant has shown no prejudice from this change. Nor has defendant shown any prejudice from the other small wording change in the jury instructions that the Court made toward the end of trial (3/29/07 Tr. 144). And, as with many of defendant's claims, this claim regarding the jury instructions ignores that the evidence at trial overwhelmingly established defendant's guilt. In any event, to show "actual prejudice" based on a challenged jury instruction, defendant must demonstrate that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." United States v. Frady, 456 U.S. 152, 169 (1981). Defendant has not met this standard. Insofar as we understand this claim, it, too, is without merit based on the evidence of defendant's guilt.

59

IV.    <u>No Evidentiary Hearing Is Necessary</u>

"An evidentiary hearing is only required where "the § 2255 motion . . . raises detailed and specific factual allegations whose resolution requires information outside of the record. . . ." <u>United States v. Pollard</u>, 290 F. Supp. 2d 153, 158 (D.D.C. 2003) (omitting internal quotation marks, quoting <u>United States v. Pollard</u>, 959 F.2d 1011, 1031 (D.C. Cir.), <u>cert. denied</u>, 506 U.S. 915 (1992)). "Even if the files and records of the case do not clearly rebut the allegations of the prisoner, no [evidentiary] hearing is required where his claims are vague, conclusory, or palpably incredible." <u>Id.</u> (omitting internal quotation marks).

This case is well-suited for summary disposition. First, as already discussed, defendant's Section 2255 motions are premature, because defendant has not yet been sentenced. Second, even if defendant had already been sentenced, resolution of the issues raised by defendant does not call for an evidentiary hearing. On the ineffective assistance of counsel claims, the record clearly establishes that defendant has not carried his burden under <u>Strickland</u> of showing deficient performance and prejudice. Hence, the Court should summarily deny defendant's ineffective assistance claims. <u>See</u> <u>United States v. Poston</u>, 902 F.2d 90, 99 n.9 (D.C. Cir. 1990) ("This court has never held that <u>any</u> claim of ineffective assistance of counsel, no matter how conclusory or meritless, automatically entitles a party to an evidentiary remand") (emphasis in original); <u>see also</u> <u>United States v. Weaver</u>, 234 F.3d 42, 46 (D.C. Cir. 2000) ("[w]hen a § 2255 motion involves ineffective assistance of counsel, a hearing is not required if the district court determines that the alleged deficiencies of counsel did not prejudice the defendant") (internal quotation marks omitted). The same is true of defendant's other claims; they are vague, conclusory, and, thus, well-suited for summary disposition.

## **CONCLUSION**

For the reasons set forth above, all of defendant's claims and outstanding post-trial

motions should be summarily denied.

<div style="margin-left: 50%;">

Respectfully submitted,

JEFFREY A. TAYLOR
D.C. Bar #498610
United States Attorney


    /s/
ELLEN CHUBIN EPSTEIN
D.C. Bar #442861
SUSAN BETH MENZER
D.C. Bar #421007
Assistant United States Attorneys
555 Fourth Street, N.W., Room 5255
Washington, D.C.  20530
(202) 514-9832
Ellen.Chubin@usdoj.gov

</div>

<u>**CERTIFICATE OF SERVICE**</u>


**I HEREBY CERTIFY** that, this 9th day of May, 2008, a copy of the foregoing has been

served via the United States District Court for the District of Columbia's ECF program upon

defense counsel of record:  Andrea P. Antonelli, Esq.


/s/ _____

Ellen Chubin Epstein
Assistant United States Attorney