# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 06-019 (EGS) |
| ) | |
| AKIUBER NDOROMO JAMES, et al. ) | |
| Defendant. ) | |

### AFFIDAVIT OF REITA PENDRY

1.   I was employed as the First Assistant Federal Defender with the Federal Public Defender from 1991 to 2000. During that time I was defense counsel in at least twenty jury trials. I have been in private practice since 2001, and I have handled criminal cases throughout that time. I have defended hundreds of criminal cases during my career.

2.   I represented Mr. Akiuber Ndoromo James in the above-captioned case in which a jury found Mr. Ndoromo guilty of twenty offenses relating to a scheme to defraud the District of Columbia's Medicaid program, including health care fraud, making false statements regarding health care matters, and money laundering.

3.   During the course of my representation of Mr. Ndoromo, I met with him on numerous occasions to discuss trial procedures and strategy and to keep him abreast of developments in the investigation.

4.   After consultation with Mr. Ndoromo, I filed three pretrial motions: Motion to Dismiss Indictment, Motion to Suppress Statements, and Motion to Suppress Physical Evidence. Each of these motions was premised on Mr. Ndoromo's version of events during execution of the search warrant at his home. Specifically, Mr. Ndoromo claimed that he was forced by agents to stand naked in a public hallway for hours while his apartment was searched.

5.   In an effort to corroborate Mr. Ndoromo's story, I asked my investigator, George Steel, a former D.C. Metropolitan Police Department homicide detective, to interview Mr. Ndoromo's neighbors and building security guards and find out if any of them had seen Mr. Ndoromo standing naked in the hallway during execution of the search warrant. My investigator found no witnesses who had seen Mr. Ndoromo at all during execution of the search warrant. My investigator interviewed Mr. Ndoromo's neighbors, who stated that they recalled the execution of the search warrant in Mr. Ndoromo's apartment but were unable to see Mr. Ndoromo during that event. My investigator also interviewed the building's security guards, who were working on the

day of the search warrant and still working there at the time of the interviews.[1] The guards stated that once the agents arrived to execute the search warrant, the guards were not allowed upstairs and thus could not see Mr. Ndoromo. My investigator found no witness who had even seen Mr. Ndoromo during execution of the search warrant, let alone would testify that he was naked at that time.

6.     Mr. Ndoromo wanted me and my investigator to locate Katrina Foster, a Medicaid recipient with mental disabilities, who, according to the government's evidence, was in jail during part of the time that Mr. Ndoromo billed Medicaid for allegedly having transported her to medical appointments. My investigator and I looked everywhere, even in Atlanta, but were unable to locate Ms. Foster.

7.     I determined that the strategy most likely to result in a verdict beneficial to my client's interests was to propound a theory of defense and strategy of cross-examination that attempted to raise a reasonable doubt as to the reliability of the Medicaid evidence on which the government based its case. As support for this theory, I cited during my closing argument, inter alia, the fact that two other Medicaid providers had used Mr. Ndoromo's supposedly unique Medicaid provider number. I also cited that the same Medicaid numbers, supposedly unique, were used by different recipients. I had elicited this information during cross-examination of one of the government's witnesses.

8.     I proceeded in the way that I thought would be in the best interest of my client, focusing on those portions of the evidence that suggested that the Medicaid data and system were flawed and that my client's conduct was unintentional.

9.     I had no personal interest in the outcome of this case and complied with all ethical rules both during and after my representation of Mr. Ndoromo. I turned over our witness list to the government in accordance with the Court's orders. At no time after Mr. Brodnax was appointed to represent Mr. Ndoromo did I ever encourage Mr. Brodnax to take any action that would be adverse to Mr. Ndoromo's interests. I turned over several boxes of files containing discovery materials and my analysis of the materials, to assist Mr. Brodnax in his representation.

10.     The documents that were seized by the government from Mr. Ndoromo's residence were made available for my review at the U.S. Attorney's Office. I spent several hours at the U.S. Attorney's Office reviewing those documents and preparing my own summaries of them. I subsequently met with Mr. Ndoromo at the Federal Public Defender's office in Baltimore and discussed my summaries of the documents with him. Mr. Ndoromo never asked to see any of the seized documents. If he had asked, I would have arranged for him to see them.

---

[1] There was one security guard who was working at Mr. Ndoromo's building on December 22, 2004, but was no longer working there at the time of the investigation. My investigator tried to track down this guard through the security company, but was unable to locate him.

11. When the Court inquired whether a copy of the indictment should be sent back to the jury room, I requested that we redact the government's factual allegations in the indictment. In my judgment, it was in the best interest of my client to compel the government to rely on testimony, documents, and argument to get its factual allegations before the jury.

I swear to the truth of the foregoing under pain and penalty of perjury, this 8th day of May, 2008.

*Reita Pendry*
Reita Pendry, Esq.